John T. OXLEY, Appellant,

v.

CITY OF TULSA, Oklahoma, a municipal corporation, By and Through the TUL-SA AIRPORT AUTHORITY, Appellees.

No. 67016.

Supreme Court of Oklahoma.

March 28, 1989.

On Rehearing July 3, 1990.

Certiorari Denied Feb. 20, 1990.

110 S.Ct. 1128.

Bruce A. McKenna, N. Franklyn Casey, Tulsa, for appellant.

J. Richard Studenny, Randall S. Pickard, J. Richard Studenny & Associates, Tulsa, for appellees.

SIMMS, Justice:

Action below for inverse condemnation. Appellant, Oxley, is the owner of approximately sixty (60) acres of land adjacent to, and partially surrounded by, the Tulsa International Airport. The chronology of events and facts are largely undisputed.

Appellant purchased the property at issue in 1951. At the time, the airport was much smaller, and used only by propeller driven aircraft. Appellant built his family home on the premises and began a horse breeding operation, all without disturbance by the airplanes using the facility.

A year later, the east runway to the airport was extended parallel to the appellant's property on the east side. Years later, in 1961, a taxiway was added to the west side of that runway to improve airport access for commercial jets. At this point in time, the appellant's property directly adjoined the taxiway. Eventually, in 1972 or 1973, because of the increasing volume of flights using the east runway and the associated noise, the appellant moved his home and horse ranching operation to other land he owned in the county. He continued, however, to use the buildings and land as rental property. Appellant testified that he had trouble keeping tenants during this time, however, because of the extreme noise associated with airport operations.

In 1975, the Trustees of the Tulsa Airport Improvement Trust adopted a master plan for airport expansion. As part of the overall scheme for future growth, the plan prohibited further development of the surrounding land for those uses described as incompatible with the airport. The primary incompatible use was residential. Because of its continued residential use, the plaintiff's land was considered a top priority for airport acquisition in the master plan. The appellant testified that an appraisal was ordered by the Airport Authority at that time, but no offer to purchase followed.

He also testified that at various times during these years he had attempted to negotiate with the Airport Authority for the purchase of his property and that at one time, he offered to agree to some type of time payment plan.

In 1980–81, a noise compatibility study was conducted as an update of the master plan, designated the "ANCLUC" study.[1] ANCLUC, too, identified the appellant's property as a priority for airport acquisition because of extreme noise impact on the property and because of its incompatible, residential, use.[2] According to the ANCLUC study, the appellant's property was in the area of highest noise impact.

Acquisition of the appellant's property was authorized at a meeting of the Airport Trustees held in June, 1982. This authorization was based on a preliminary draft of the ANCLUC study. The minutes of the meeting show that the trustees planned to fund the purchase of the property with money owed the airport by the city of Tulsa. These minutes also show that it was the trustees' belief at the time that later development of the property would reimburse the airport for the funds used to purchase the land. Appraisers were again sent to establish a value for the property. In September of that year, the property owners in the impact area were notified that the Airport was considering acquisition of the property and were given information about landowner's condemnation rights. That notification advised them not to relocate or contract with third parties for the sale of his property since that would risk "losing your eligibility for relocation assistance." The owners were also asked to cooperate with the Airport Authority by providing abstracts of title, which the Airport would have updated.

The record shows that three months after receipt of the aforementioned letter, the appellant filed an application with the city to change the zoning for his property to light industrial and commercial. A hearing on this application was held on January 6, 1983. That same day, the airport offered to purchase the property for $1,500,000.00. This offer was rejected within a few days in a letter from the appellant's attorney with the comment that the property "was not for sale."

The next communication was in a letter dated March 22, 1983, from the appellant's attorney addressed to the airport director. In this letter, the director is reminded that the appellant is appealing the denial of his application for a special zoning exception to the district court and asks the director for information on the terms the airport would impose for an agreement to access airport facilities so the appellant could develop his property for airport-related businesses. The airport director responded with a general outline of "through-the-fence"[3] requirements by letter dated June 1, 1983. There was, apparently, no further written communication between the appellant and airport authorities on this request, nor do the minutes of the Trustees' meeting, held the following month, show that the trustees were advised about the appellant's inquiry. Those minutes do, however, show that the trustees gave final approval and adoption to the ANCLUC noise control

1. "ANCLUC" is the acronym used to designate The Airport Noise Compatibility and Land Use Study. The airport director testified that this study is an additional planning document required by the Federal Aeronotics Administration as an update to the master plan in order to qualify for certain types of federal funds.

2. An examination of ANCLUC shows that the parcel in question is the first acquisition priority and is discussed solely in terms of acquisition. ANCLUC does state that afterwards, the property could be developed for airport compatible uses and that development could be used to defray the costs of its purchase. The study recommended that "every effort should be made to purchase properties on an opportunity basis, rather than resorting to condemnation."

3. "Through-the-fence" is a term of art used in airport operations to denote a plan whereby a private landowner is allowed access to publicly owned airport property, subject to certain conditions adapted from FAA recommendations, in order to conduct a private business in airport-related enterprises. Without a "through-the-fence" agreement, persons desiring to conduct these businesses must lease facilities from the airport itself. According to trial testimony, income from such lease agreements provides a significant portion of an airport's operating income.

study and approved a change in the private property acquisition policy. Under this change, land would no longer be acquired by large blocks, but rather as individual parcels within the discretion of the airport staff. A prioritization plan was still established. As residential land, the appellant's property continued to have the highest priority.

The appellant was successful in his re-zoning efforts and his property was re-zoned for commercial and light industrial uses in December, 1983. Feeling that he was unable to competitively develop his property because of the airport's requirements for "through-the-fence" operations and its alleged stated intention to "take" the property, the appellant filed this inverse condemnation on February 14, 1984.

Commissioners were appointed and returned an appraisal of $1,250,000.00 in damages. The City of Tulsa filed exceptions to the report; plaintiff/appellant's demand for a jury trial was granted.

At trial, the appellant sought to show a fee simple de facto taking of his property, allegedly accomplished by the airport in two stages. The first stage was the alleged de facto taking of the residential use and enjoyment of the property by excessive noise, fumes and odors. The Airport does not contest the fact that the fumes, noise and odors caused a substantial impairment to the residential use of the property.

The second stage, as alleged by the appellant, was a taking by the airport of all other uses by oppressive and anti-competitive conduct, resulting in the appellant being unable to develop his land for its highest and best use: airport related light industrial and commercial uses.

By pretrial order, the court divided the trial into two phases. The first phase was on the issue of whether there had been a de facto taking. The second phase was to be on the issue of the extent of the taking and damages therefor. At the same time, the court sustained the city's motion in limine to exclude all mention of alleged anti-competitive acts by the airport and to limit introduction of the ANCLUC study only as it related to noise, overflights and odors. The court ruled that the excluded evidence would only be relevant to the issue of damages. At the close of the first phase, the jury returned a verdict for defendant city. Oxley's motions for new trial and judgment notwithstanding the verdict were subsequently overruled by the trial court and this appeal followed. Later, as prevailing party, the city presented motions to the court requesting that Oxley be assessed the costs of the commissioners appointed to assess damages and seeking to recover the costs of defending the action. The court denied these motions and the city cross-appeals.

## I.

As appellant Oxley's first proposition of error, he argues that the trial court erred when it refused to grant his motion for judgment on the opening statements and further erred in refusing to grant his motions for directed verdict and judgment notwithstanding the verdict. We cannot agree.

Oxley's petition alleged a fee simple "taking" of his property. At best, the city only admitted that the airport operations surrounding the appellant's property made that land unsuitable for residential use. A dispute remained as to whether the airport's operations effected a de facto taking of all other uses. Resolution of this dispute required a factual determination of whether the interference of the appellant's use by noise, odors and fumes associated with airport operations was of such a substantial nature as to take the appellant's property in fee. This is a jury question and it would have been error to sustain Oxley's motions for judgment on the opening statements and for directed verdict. *Mattoon v. City of Norman*, Okl., 617 P.2d 1347 (1980). The test is "whether there is a sufficient interference with the landowner's use and enjoyment to constitute a taking. [This question] is one that the trier of facts must decide." *Mattoon*, supra, at 1349. *Henthorn v. City of Oklahoma*

*City,* Okl., 453 P.2d 1013 (1969).[4]

As a portion of his third proposition of error, the appellant raises the same issue as in his first proposition when he states that the trial court erred in allowing the jury to determine a matter of law, whether noise, overflights and odors effected a taking of his property. This proposition misstates the jury function in an inverse condemnation action. After review of the transcript of the hearing on the appellant's motions, discussed above, it is clear that the trial court was not charging the jury with the task of resolving the legal question of a "taking", but rather with the task of making the factual findings which must necessarily precede the legal conclusion urged by appellant. *Henthorn,* supra, at 1016.

## II.

█ In support of his arguments that the trial court should find a de facto taking as a matter of law, Oxley argued that an intent by a municipality to acquire property, coupled with some unequivocal act in furtherance of that intent, is tantamount to an overt act by the municipality to assert dominion and control. This is also the argument for appellant's second assignment of error on appeal.

The record shows that the city, through the Airport Authority, has expressed its intent and plan to acquire the appellant's land. The appellant's land is often referred to in the ANCLUC study as a priority for acquisition. There can be no doubt that the airport was attempting to implement the plan when it offered to purchase the appellant's property.

In *State, ex rel., Department of Highways v. Cook,* Okl., 542 P.2d 1405 (1975), another inverse condemnation action, a

landowner had alleged that the state had engaged in a number of activities which served to inhibit private development of the appellant's land as a precursor to later acquisition. Among these, *inter alia,* were the state's published plans for future development of the landowners property; the state's refusal to act on applications for development presented by private developers; and the city's denial of an application to change the zoning for the landowner's property in order to accommodate the state's future development plans. When presented with facts showing those, and other, acts by the state in furtherance of a master plan for land acquisition, this Court said in *Cook,* that "there is neither an actual taking nor has there been demonstrated any overt act leading to exercise of dominion and control over [the] property upon which to base a finding of de facto taking." *Cook,* supra, at 1407.

Similarly, in this case, the appellant has only shown that the Airport Authority planned to acquire his property, as demonstrated by the offer to purchase and ANCLUC. Also, the appellant has shown that one developer chose not to proceed with negotiations to purchase the land in question; that decision was based, in part, on the Airport Authority's stated intentions. Because of the trial court's ruling in limine, the appellant's assertions that the airport imposed unreasonable restrictions on through-the-fence operations and engaged in other "discriminatory" and "anti-competitive" practices, are all without factual support in this record. But even assuming, arguendo, that the record disclosed facts in support of the appellant's allegations of discrimination and anti-competitive practices, there would still be insufficient showing

4. It is important to note at this point that the appellant's burden was to prove significant impairment of the fee estate in his property, rather than impairment of a single use, i.e.: residential. In recognizing this point, we note that the appellant, voluntarily and with full knowledge regarding the airport's intentions and the reasons for those intentions, elected to have his property rezoned to a compatible use. Oklahoma and other jurisdictions have recognized the doctrine of "estoppel by acquiescence". See

e.g.: *Oklahoma City v. Wells,* 185 Okl. 369, 91 P.2d 1077; *Becker v. Rolle,* 211 Kan. 769, 508 P.2d 509 (1973); *Scott v. Jordan,* 99 N.M. 567, 661 P.2d 59 (App.1983). "Acquiescence arises where a person who knows he is entitled to impeach a transaction but neglects to do so for such length of time that, under the circumstances of the case, the other party may fairly infer that he has abandoned his right." *Becker,* supra, 508 P.2d at 514, citing: *Black's Law Dictionary,* 4th Ed. at 40 (emphasis supplied).

under *Cook,* supra, to form the basis of a finding that a de facto taking had occurred.

■ The appellant's allegations of anti-competitive practices are based on the Airport Authority's alleged refusal to allow him low cost access to the runway in order to increase the profitability of private enterprises conducted on his own land. Even if true, the essence of the appellant's argument is that unless an adjacent landowner, in this case a public entity, grants him low cost access to public land, a taking has been effected because the appellant cannot conduct as profitable a business enterprise without the access. Here, there is no "taking" of access, but rather a refusal to grant access.

As in the case of land adjacent to a major highway, access, or the lack thereof, becomes an element of value to be taken into account once a "taking" has been shown. *Gaylord v. State, ex. rel., Department of Highways,* Okl., 540 P.2d 558, 561 (1975). Refusal to grant access does not, however, constitute an "overt" act leading to the exercise of dominion and control. *Gaylord,* supra, at 561; *Cook,* supra, at 1407. We are unaware of any authority, nor has authority been cited, which supports the appellant's contentions to the contrary.

### III.

As an additional argument under his third proposition, the appellant alleges that juror misconduct was, in part, the cause of the verdict in favor of the city, and that the trial court erred when it did not grant a new trial when informed of the alleged misconduct. Primarily, the appellant's arguments are based on his post-trial realization that one of the jurors had a prior business relationship with the appellant and the belief that the juror harbored a grudge against the appellant. In support of these allegations the appellant offered the affidavits of himself, the bailiff, an alternate juror, and one juror.

■ The appellant's affidavit simply states that it was only when the trial had been completed that he became aware that the jury foreman, Gatewood, had lost a substantial amount of insurance business as a result of a business decision made by the appellant. The affidavit of the bailiff states that during the trial, juror Gatewood had asked the bailiff to provide him with a list of the jurors' names and their seating arrangements; the request was refused. The alternate juror's affidavit states that Gatewood had stressed to her the fact that the appellant was wealthy and owned a 6,000 acre ranch in addition to the property at issue. She stated in the affidavit that she "was shocked to learn that the jury had returned a verdict for the City of Tulsa." Lastly, the affidavit of juror Roberts is offered which describes at length the deliberation process used by the jury and his perception that jury foreman Gatewood coerced the jury into its verdict.

The cases are legion in which this Court has ruled that affidavits, depositions and oral testimony of jurors may not be used to impeach a jury verdict. See: *Barnhart v. International Harvester Company,* Okl., 441 P.2d 1000, 1007 (1968), and cases cited therein. A single exception to this established rule exists by statute.

■ Title 12 O.S.1981 § 2606(B) authorizes jurors to testify regarding allegations of misconduct. The pertinent provisions of that statute state:

"Upon an inquiry into the validity of the verdict ..., a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent or dissent from the verdict ... or concerning his mental processes during deliberations. *A juror may testify on* the question *whether extraneous* prejudicial *information* was improperly brought to the jury's attention *or* whether *any outside influence* was improperly brought to bear upon any juror ..." 12 O.S.1981 § 2606(B) (emphasis added).

See also: *Willoughby v. City of Oklahoma City,* Okl., 706 P.2d 883 (1985). An examination of the affidavit of juror Roberts in light of the above statute makes it patently obvious that all the allegations contained

therein are inadmissible pursuant to 12 O.S.1981 § 2606(B). The remaining affidavits do not contain allegations of fact sufficient to support the grant of a new trial based on a finding of jury misconduct. *Willoughby,* supra; *Barnhart,* supra. *Holden v. Coussens,* Okl., 576 P.2d 758 (1978).

IV.

█ Lastly, the appellant argues that the trial court erred in refusing to submit a special interrogatory to the jury, resulting in "a verdict whose basis is unknown". This argument is based on the premise that the jury could have found for the City of Tulsa on one of two possible theories: absence of significant impairment to constitute a de facto taking; or, that the appellant's claim was barred by the applicable fifteen-year statute of limitations, 12 O.S. 1981 § 93(4); *Oklahoma City v. Wells,* 185 Okl. 369, 91 P.2d 1077, 1083 (1939).

A review of the transcript reveals that the appellant misstates the facts in this proposition of error. This transcript shows that the appellant did not request a special interrogatory prior to the time the jury was discharged. The settled rule regarding such propositions of error is that an objection to the form of a jury verdict is deemed waived unless an objection is made at the time the verdict is received and before the jury is discharged. *Miller v. Judd,* Okl., 429 P.2d 714, 717 (1967); *Morgan v. Oklahoma Natural Gas Co.,* Okl., 561 P.2d 1363 (1977).

V.

On cross-appeal, the city argues that the trial court erred when it denied the city's motions to assess the commissioners' costs against Oxley and when it denied the city's motion to assess costs of defending the action.

█ We are unable to address the merits of the issues raised on cross-appeal. The City of Tulsa/cross-appellant has failed to ensure that the record on appeal

contains the order appealed from or any other necessary documents. No designation of record appears in this cross-appeal. Failure of an appellant to designate a record on appeal constitutes an abandonment and the appeal is subject to dismissal. *Matter of Burkhart's Estate,* Okl., 562 P.2d 1151 (1977). This Court is left with no record to examine. It is the cross-appellant's duty to ensure that there has been prepared a sufficient trial court record to show cause for reversal at the appellate level. *MFA Insurance Co. v. Jones,* Okl. App., 620 P.2d 472 (1980). *Hamid v. Sew Original,* Okl., 645 P.2d 496 (1982). The cross-appeal by the City of Tulsa is dismissed.

VI.

Accordingly, for the reasons stated herein, the judgment on the verdict for defendant City of Tulsa is AFFIRMED. The cross-appeal to the trial court's order charging the city with the Commissioners' costs and denying its motion for costs of defending the action is DISMISSED.

HARGRAVE, C.J., and LAVENDER, DOOLIN and SUMMERS, JJ., concur.

OPALA, V.C.J., and HODGES, ALMA WILSON and KAUGER, JJ., concur in part, dissent in part.

SUPPLEMENTAL OPINION ON REHEARING

SIMMS, Justice.

This cross-appeal by the City of Tulsa (City) was dismissed for failure to provide a complete record for review. See: page 742 supra. Subsequently the Court allowed the record to be corrected by amendment based upon affidavit of the Court Clerk regarding the omission.

Rehearing on cross-petition was granted to consider whether the trial court erred in assessing the commissioner's fees to City and denying recovery of City's court costs. We find no error and affirm.[1]

---

1. Appellant Oxley sought certiorari to the Supreme Court of The United States in the principal opinion. This opinion on rehearing awaited disposition of that writ by the Supreme Court.

In his petition in inverse condemnation against Tulsa, Oxley requested the trial court to appoint three disinterested landowners in Tulsa County, Oklahoma, to inspect the property allegedly taken by City and determine its value. The trial court appointed three commissioners who executed their duties and submitted a bill for their services in the sum of $3,500.00 each. The proceedings went to trial, and the jury returned a verdict for City. Soon thereafter, City moved for the trial court to assess the commissioners' fees to Oxley. The trial court ordered City to pay the commissioners' fees since City was the condemnor in the action and added pre-judgment and post-judgment interest to the $3,500.00 fee for each commissioner. City also moved to recover court costs from Oxley. This request too was denied.

■■■■ The constitutional and statutory provisions relating to eminent domain must be strictly construed in favor of the landowner and against the condemning party. *State, ex rel., Southwestern Natural Gas Co. v. Brewer*, 184 Okl. 129, 87 P.2d 954 (1939). One such provision is article 2, § 24 of the Oklahoma Constitution which provides:

"Private property shall not be taken or damaged for public use without just compensation. Such compensation, irrespective of any benefit from any improvements proposed, shall be ascertained by a board of commissioners of not less than three freeholders, in such manner as may be prescribed by law...."

The parties are entitled to object to the finding of the commissioners and submit the case to a jury for resolution of the compensation issue. 66 O.S.1981, §§ 53–55. Regardless of this statutory entitlement, the state constitution grants Oxley the right to have three freeholders determine the value of his land in order to compensate him before or after it is taken. City would have Oxley pay for his constitutional right to a board of commissioners solely because he requested them. Such a rule contradicts the statutes governing condemnation proceedings in Oklahoma.

Certiorari was denied February 26, 1990, —

The trial court based its decision on 28 O.S.1981, § 152.3 which provides, in pertinent part, as follows:

"Every condemnor, be it the state, a political subdivision thereof, or a private entity, shall be liable for poundage fee and court costs in a condemnation proceeding."

City's only argument is that it is not a "condemnor" as the statute contemplates the term, and, therefore, cannot be held liable for court costs. City cites 66 O.S. 1981, §§ 53, 57 and 58 as its authority. First, it argues that Section 53 implies that "condemnor" refers to the party which initiates a condemnation proceeding, and that since Oxley initiated the inverse condemnation action, City cannot be the condemnor. City next asserts that Section 57 implicitly defines "condemnor" as the entity that actually takes and occupies the land of a private party. Since City did not take nor occupy Oxley's land, it argues it cannot be the condemnor. City concludes that the procedures of Section 58 should be followed in taxing the commissioners' fees as costs against Oxley.

We disagree that "condemnor" must be defined by either Section 53 or 57. Neither provision clearly defines the term. Rather, the statutes describe the rights and duties of the condemnor and condemnee in condemnation proceedings. Moreover, Section 58 does not apply because it relates to the fees owed to substitute commissioners where one of the commissioners appointed cannot act due to death, absence, refusal or neglect.

Oxley cites *Southern Ry. Co. v. Jennings*, 130 Tenn. 450, 171 S.W. 82, 83 (1914) for the definition of "condemnor." However, the Court in *Jennings* derived its definition from a Tennessee statute which makes the holding less persuasive since Oklahoma does not have a similar statute. Moreover, the few cases that have defined the term "condemnor" relate the definition to specific statutes or uses of the term in statutes. However, all point to the condemnor as being the party with the power

U.S. —, 110 S.Ct. 1128, 107 L.Ed.2d 1034.

to exercise the right of eminent domain or the party actually taking the realty of others.

The Tenth Circuit, in *Grand River Dam Authority v. Jarvis*, 124 F.2d 914, 916 (1942), construed the constitutional rights of Oklahoma landowners under Article 2, § 24, supra:

"Without exception, the decisions hold that in an original proceeding for the condemnation of land the costs arising in the proceeding fall on the condemnor. The reason therefor is that to take the land against the landowner's wishes and then charge him for the cost of taking would violate the constitutional prohibition against the taking of private property without just compensation [Okla. Const. art. 2, § 6].... As the property cannot be taken until the compensation is paid, and as it cannot be paid until it is ascertained, the duty of ascertaining the amount is necessarily cast upon the party seeking to condemn the property, and he should pay all the expenses which attach to the process. Any law which casts this burden upon the owner should, in our opinion, be held to be uncostitutional."

Implicit in this holding is the understanding that the condemnor is the party taking the property. Moreover, the court in *Grand River Dam Authority* appears to hold that expenses arising as a result of the condemnation proceeding are more naturally and equitably placed upon the taking party because the land is going to the taking party for their use. As the Tenth Circuit court sees it, the costs of the proceeding are a part of the compensation a landowner is entitled to receive under art. 2, § 24. We agreed with this rationale in *Oklahoma City Urban Renewal Authority v. Lindauer*, Okl., 534 P.2d 682, 685 (1975). Moreover, in countless eminent domain cases handed down by this Court since statehood, we have referred to the parties as condemnor and condemnee in the same way as the Tenth Circuit Court did in *Grand River Dam Authority*. City directs us to no cases which refer to or consider a landowner who institutes an inverse condemnation action as the condemnor. We conclude that the term "condemnor" refers to the entity condemning or taking property from a landowner, in this case, the City of Tulsa. We find no legislative guidance suggesting otherwise, and refuse to define the term to include individuals or entities other than a condemning party. Any definition of "condemnor" to include a landowner bringing an inverse condemnation action must be supplied by the legislature and not by this Court.

As we noted in the merits opinion, landowners in the area surrounding the airport, including Oxley, were contacted about possible condemnation of their property and informed of their rights under the law of eminent domain. Under these facts, City is the condemning party, and, therefore, the "condemnor" in the condemnation proceeding. As such, City must pay the costs of the action under 28 O.S.1981, § 152.3, supra. Therefore, we find that under 28 O.S. 1981, § 152.3 and 66 O.S.1981, §§ 53–58, the trial court did not abuse its discretion or commit error in assessing the commissioners' fees to City.

■ City next asserts error by the trial court in denying it's motion to recover court costs. City maintains that this denial was in derogation of its right to recover costs as the prevailing party pursuant to 12 O.S.1981, § 929 which states that "[c]osts shall be allowed of course to any defendant, upon a judgment in his favor in the *actions* mentioned in [12 O.S.1981, § 928]." (Emphasis added) The actions mentioned in Section 928 are those "for the recovery of money only, or for the recovery of specific, real or personal property." These provisions allow costs to to the prevailing party in a civil action. They do not apply to condemnation proceedings because "[c]ondemnation proceedings do not involve a tort and are not civil actions at law or suits in equity, but are special statutory proceedings." *Graham v. City of Duncan*, Okl., 354 P.2d 458, 461 (1960).

Furthermore, condemnation proceedings have separate statutes which specifically provide for the reimbursement of costs and expenses. 66 O.S.1981, § 152.3 and 27 O.S.

1981, §§ 9–12. Long-standing rules of statutory construction require us to apply the specific provisions which clearly include the matter in controversy rather than the general civil procedure provisions. *City of Tulsa v. Smittle*, Okl., 702 P.2d 367, 371 (1985). Title 27 O.S.1981, § 12 provides for judgments in favor of a plaintiff in an inverse condemnation proceeding to include reasonable costs and expenses. However, no provision is made for the reimbursement of expenses to a condemnor who prevails in an inverse condemnation proceeding. Hence, the trial court's reliance on 66 O.S. 1981, § 152.3 is proper. Therefore, we find 12 O.S.1981, § 929, does not apply to condemnation proceedings, and the trial court did not err in denying City's motion for costs.

For the above reasons, the orders of the trial court are AFFIRMED.

HARGRAVE, C.J., and LAVENDER, DOOLIN and SUMMERS, JJ., concur.

OPALA, V.C.J., and HODGES, ALMA WILSON and KAUGER, JJ., concur in Opinion On Rehearing.