Latricia **BRANNON**, Teresa Cole, Glendale Bonner, Shelonia Bonner, Connie Bastion, Mahlon Bastion, James Parson, Maxine Scott, Richard Scott, Ronald Miller, and Sheila Johnson, Appellants,

v.

**CITY OF TULSA**, Oklahoma, Appellee.

No. 84257.

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 13, 1996.

Michael C. Taylor, Stephen M. Grayless, Michael C. Taylor & Associates, Tulsa, for Appellants.

Michael C. Romig, Assistant City Attorney, City of Tulsa, Tulsa, for Appellee.

## MEMORANDUM OPINION

ADAMS, Vice Chief Judge:

Appellants (collectively, Tenants) sued the City of Tulsa (City) for damages sustained to their real and personal property while Tulsa police officers were attempting to apprehend an armed murder suspect located in the multi-building apartment complex occupied by Tenants (the complex). In addition to negligence, Tenants claimed City's actions amounted to an unconstitutional taking of private property without just compensation. The trial court summarily adjudicated Tenants' taking claim in favor of City, but the negligence claim was tried to a jury. After a verdict against Tenants on the negligence claim, the trial court entered judgment based on that verdict and its earlier order denying Tenants any recovery. Tenants appeal, arguing only that summary judgment on their taking claims was inappropriate because there existed material issues of fact for a jury to resolve.

In addressing Tenants' claim that summary adjudication was inappropriate, we must examine the pleadings, depositions, affidavits and other evidentiary materials submitted by the parties and affirm if there is no genuine issue as to any material fact and City was entitled to judgment as a matter of law. *Perry v. Green,* 468 P.2d 483 (Okla. 1970). All inferences and conclusions to be drawn from the evidentiary materials must be viewed in a light most favorable to Tenants. *Ross v. City of Shawnee,* 683 P.2d 535 (Okla.1984). We are limited to the issues actually presented below, as reflected by the record which was before the trial court rather than one that could have been assembled. *Frey v. Independence Fire and Cas. Co.,* 698 P.2d 17 (Okla.1985).

## FACTS

In the early afternoon of May 9, 1991, officers of the Tulsa Police Department (the police) went to search for two murder suspects at the complex. They located one of the suspects hiding in his grandmother's apartment, and with help from the suspect's father, determined the suspect was armed, wearing a bullet-proof vest, and unwilling to speak to the police. Around 5:45 p.m., the police called their Special Operation Team (SOT) for assistance in apprehending the suspect. About the same time, the police began evacuating Tenants from their apartment building because it was located directly across from the building in which the suspect was hiding. One of two SOT sniper teams was placed in Apt. 8 of Tenants' building, although the evidentiary materials reveal a dispute concerning whether the occupant of Apt. 8 consented to the use of his apartment. Around 7:00 p.m. that evening, a couple of tenants were permitted to return to their apartments because of the lack of gun fire.

However, after the suspect shot "an 8–10 round burst of 9mm" through his grandmother's apartment door around midnight, those same tenants were re-evacuated.

Throughout the remainder of the night, the police tried unsuccessfully to coax the suspect to surrender. Between 6:00–7:30 a.m. on May 10, 1991, they inserted tear gas into the apartment three different times, with no response. At 7:40 a.m., after the police attempted to tear down the living room curtains in his grandmother's apartment, the suspect fired numerous rounds through her living room windows and door. Approximately eight minutes later, when one of the sniper team members in Apt. 8 moved to get a better view, the suspect fired numerous rounds into that apartment, striking an aerosol paint can which exploded into flames and set fire to the apartment. Firefighters, who were already at the scene, could not control the fire even with police assistance because of the immediate threat of harm from the suspect. By 8:10 a.m., the entire upper floor of Tenants' apartment building was engulfed in flames and smoke. The police's confrontation finally ended around 7:10 p.m. that evening when the suspect committed suicide.

## ANALYSIS

■ Tenants' claim is premised upon alleged violations of the Fifth Amendment to the United States Constitution and Article 2, § 24 of the Oklahoma Constitution. The Fifth Amendment provides in part: "[n]or shall private property be taken for public use, without just compensation." Its guarantee was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). "Taken" within the Fifth Amendment includes not only substitution of ownership but deprivation of ownership, including damage to and destruction of property. *United States v. General Motors Corporation,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Similarly, Article 2, § 24 provides that "[p]rivate property shall not be taken or damaged for public

use without just compensation." Given the interpretation placed on the Fifth Amendment in *United States v. General Motors,* there appears to be no difference between the protections afforded Oklahoma citizens under either provision, and neither party has suggested any.

■ Our courts have recognized that Article 2, § 24 is not a grant of power, but a limitation on the exercise of the power of eminent domain which is recognized as a necessary attribute of sovereignty. *Kelly v. Oklahoma Turnpike Authority,* 269 P.2d 359 (Okla.1954). Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property, whereas inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Stewart v. Rood,* 796 P.2d 321, nt. 32 (Okla.1990).

■ Police power, also considered an attribute of sovereignty, comprehends the power to make and enforce all reasonable laws and regulations necessary for the advancement and protection of the public welfare. It cannot be invoked except to protect and promote public morals, health, safety and prosperity. *State ex rel. v. Wood,* 207 Okl. 193, 248 P.2d 612 (1952). In discussing the difference between these two sovereign powers, the Court in *Phillips Petroleum Co. v. Corporation Commission,* 312 P.2d 916, 921 (Okla.1957), quoted from 29 C.J.S., Eminent Domain, § 6, p. 784:

It has been said to be difficult to distinguish consistently between the right of eminent domain and the police power, so that they have sometimes been confused; however, they are quite distinct, although analogous. Briefly, eminent domain takes property because it is useful to the public, while the police power regulates the use of property or impairs rights in property because the free exercise of these rights is detrimental to public interest; and the police power, although it may take property, does not, as a general rule, appropriate it to another use, but destroys the property, while by eminent domain property is taken

from the owner and transferred to a public agency to be enjoyed by the latter as its own.... [I]n the exercise of eminent domain private property is taken for public use and the owner is invariably entitled to compensation, while the police power is usually exerted merely to regulate the use and enjoyment of property by the owner, or, if he is deprived of his property outright, it is not taken for public use, but rather destroyed in order to promote the general welfare, and in neither case is the owner entitled to any compensation for any injury which he may sustain, for the law considers that either the injury is damnum absque injuria or the owner is sufficiently compensated by sharing in the general benefits resulting from the exercise of the police power.

 Based upon this language from *Phillips,* City argues its actions were the latter and no compensation is due. However, in *Mattoon v. City of Norman,* 617 P.2d 1347, 1349 (Okla.1980), the Court noted "[w]e have never held that a finding that the exercise of police power is valid absolutely precludes compensation for property taken or damaged by such exercise." City argues that *Mattoon* and the cases cited therein are inapplicable because they involve an exercise of the police power by adoption of regulations. However, in *Frost v. Ponca City,* 541 P.2d 1321 (Okla. 1975), the Court found it was a valid exercise of the police power to remove refined gasoline from under the plaintiffs' land, and determined the landowners were entitled to compensation for the gasoline so produced, indicating a broader application is warranted. Moreover, City has offered no reason why an actual physical occupation, which is clearly more intrusive on the rights of the owner than mere regulation, should not give rise to compensation under circumstances where a regulation would.

 Tenants' argument that factually similar cases decided elsewhere support recovery is similarly unpersuasive. Each of those cases involve damage inflicted by the police during an attempt to apprehend a suspect or otherwise enforce the law. Here a jury has determined that police negligence did not cause the damage. The issue before us is whether a governmental agency can be held liable, under the Fifth Amendment or Article 2, § 24, for damages to property of innocent parties *caused by third parties* during a temporary occupation of the premises. We do not decide whether damage directly caused by a public action, with or without negligence, would constitute a taking.

Our research reveals that this issue has only been addressed in one case—*National Board of Y.M.C.A. v. United States,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969). In *Y.M.C.A.,* the petitioners sought compensation for damages *caused by rioters* to buildings temporarily occupied by U.S. troops during riots in the Panama Canal Zone in January 1964. The Court of Claims found that the record established that the troops were not sent there for the purpose or with the intention of requisitioning or taking petitioners' buildings to house soldiers but were ordered there to remove the rioters from the buildings to prevent further loss or destruction. The Court of Claims held that the actions of the Army did not constitute a taking within the meaning of the Fifth Amendment and granted the Government's motion for summary judgment. On appeal, the United States Supreme Court, 395 U.S. at 90–92, 89 S.Ct. at 1515, affirmed, first noting the troops were defending petitioners' buildings and then stating:

> Of course, any protection of private property also serves a broader public purpose. But where, as here, the private party is the *particular intended beneficiary* of the governmental activity, "fairness and justice" do not require that losses which may result from that activity "be borne by the public as a whole," even though the activity may also be intended incidentally to benefit the public. Were it otherwise, governmental bodies would be liable under the Just Compensation Clause to property owners every time policemen break down the doors of buildings to foil burglars thought to be inside. (Citations omitted.) (Emphasis added.)

However, the Court, 395 U.S. at 91, 89 S.Ct. at 1516, stated that petitioners' claim would have failed for yet another reason, which they explained as follows:

On oral argument, petitioners conceded that they would have had no claim had the troops remained outside the buildings, even if such presence would have incited the rioters to do greater damage to the buildings. We agree. But we do not see that petitioners' legal position is improved by the fact that the troops actually did occupy the buildings. Ordinarily, of course, governmental occupation of private property deprives the private owner of his use of the property, and it is this deprivation for which the Constitution requires compensation. There are, however, unusual circumstances in which governmental occupation does not deprive the private owner of any use of his property. For example, the entry by fireman upon burning premises cannot be said to deprive the private owners of any use of the premises. In the instant case, the physical occupation by the troops did not deprive petitioners of any use of their buildings. At the time the troops entered, the riot was already well under way, and petitioners' buildings were already under heavy attack. Throughout the period of occupation, the buildings could not have been used by petitioners in any way. Thus, petitioners could only claim compensation for the increased damage by rioters resulting from the presence of the troops. But such a claim would not seem to depend on whether the troops were positioned in the buildings. Troops standing just outside a building could as well cause increased damage by rioters to that building as troops positioned inside. In either case—*and in any case where government action is causally related to private misconduct which leads to property damage—a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment.* The Constitution does not require compensation every time violence aimed against government officers damages private property. Certainly, the Just Compensation Clause could not successfully be invoked in a situation where a rock hurled at a policeman walking his beat happens to damage private property.

Similarly, in the instant case, we conclude that the *temporary, unplanned* occupation of petitioners' buildings in the course of battle does not constitute direct and substantial enough government involvement to warrant compensation under the Fifth Amendment. (Citations omitted.) (Emphasis added).

Even if we were to conclude that Tenants' evidence established that the public, not Tenants, were the particular intended beneficiary, our analysis would not stop. As required by *Y.M.C.A., in any case where government action is causally related to private misconduct which leads to property damage,* a determination must be made whether City's involvement "in the deprivation of private property" was sufficiently direct and substantial to require compensation under the Fifth Amendment. As in *Y.M.C.A.,* this record clearly demonstrates that City did not go to the complex with the intent to take over or even use Tenants' building, but instead to locate two murder suspects and hopefully apprehend them, without incident. Instead, City discovered that one of the suspects was well-armed and ready for battle, thus necessitating the call to SOT, evacuation of Tenants' apartment building, and occupation of one apartment. Nor can we can say City deprived Tenants of any use during the occupation. Due to the volatile nature of this type of confrontation, Tenants would not have been safe inside their apartments whether City was inside or outside the apartment building. Although City permitted one or two tenants to return to their apartments, the decision was based on the fact that no shots had been fired up to that point and the location of their individual apartments.

Based on the applicable law, the facts revealed by the evidentiary materials presented to the trial court, considered in the light most favorable to Tenants together with all reasonable inferences from those facts, are consistent only with the conclusion that City's temporary and unplanned occupation of Tenants' apartment building in the course of apprehending an armed murder suspect did not constitute direct and substantial enough government involvement to warrant compensation under the Fifth Amendment

and Article 2, § 24. Accordingly, the trial court's summary judgment order denying Tenants' taking claim was appropriate. Inasmuch as Tenants have not identified any other alleged error of the trial court, the trial court's judgment is affirmed.

AFFIRMED.

CARL B. JONES, P.J., and GARRETT, J., concur.