2000 OK CIV APP 19

**Peggy J. WILLIAMS and Douglas A. Williams, Sr., husband and wife, Plaintiffs/Appellees,**

**v.**

**The STATE of Oklahoma, ex rel. DEPARTMENT OF TRANSPORTATION, Defendant/Appellant.**

**No. 91,605.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Feb. 4, 2000.

Morris Bell, William J. Rinehart, Department of Transportation, Legal Division, Oklahoma City, Oklahoma, For Appellant.

Leonard M. Logan, Logan & Lowry, L.L.P. Vinita, Oklahoma, For Appellees.

JOPLIN, Judge:

¶ 1 Defendant/Appellant The State of Oklahoma, ex rel. Department of Transportation (ODOT), seeks review of the trial court's order granting judgment to Plaintiffs/Appel-

lees Peggy J. Williams and Douglas A. Williams, Sr., husband and wife (hereinafter, the Williams), on the Williams' reverse[1] condemnation claim. In this appeal, State alleges the trial court erred in granting judgment to the Williams without a trial by jury or any other factual adjudication of the prerequisite issue of a compensable "taking."

I.   Statement of the Case and Facts

¶ 2 On November 18, 1996, the Williams filed their petition, alleging, inter alia, substantial interference with the use and enjoyment of their two separate tracts of property,[2] and damage to their business, as a result of ODOT's "taking" abutting property for street and/or highway improvements, and demanded a jury trial. On December 10, 1996, ODOT entered a general appearance, reserving time to further plead or answer, but filed no other pleadings within the reserved period.

¶ 3 Upon notice to the parties, on February 24, 1997, the trial court appointed commissioners to appraise the allegedly affected property. On October 3, 1997, the commissioners filed two reports,[3] determining damages to both of the Williams' tracts in the total sum of $120,000.00. On October 6, 1997, the Williams filed a separate objection to each of the commissioners' reports as inadequately determining damages, and demanded jury trial on the issue of damages. ODOT filed neither objections to the reports of the commissioners, nor a request for jury trial.

¶ 4 On December 8, 1997—two days after expiration of the sixty (60) day period to demand a jury trial pursuant to 66 O.S.1991 § 55(A)—the Williams filed a "Withdrawal of Demands for Jury Trial." On the same date, they also filed a "Motion to Enter Judgment Pursuant to Reports of Commissioners," to which ODOT objected.

---

1.  The term "reverse" was first used in *Levi v. Oklahoma*, 1947 OK 115, 198 Okla. 414, 179 P.2d 465 and *Crowl v. Tidnan*, 1947 OK 112, 198 Okla. 650, 181 P.2d 549. "Inverse" was first used in *Henthorn v. Oklahoma City*, 1969 OK 76, 453 P.2d 1013. Both terms have been used interchangeably since.

2.  The Williams alleged they occupied one of the tracts by virtue of a valid and subsisting lease, and owned the other tract.

3.  I.e., one report as to the property leased by the Williams, and one report on the property owned by the Williams.

## II. Trial Court's Dilemma

¶ 5 Williams argued that the constitutional and statutory procedures applicable for regular condemnation actions, were the only procedures available in an reverse condemnation action.[4] In support of this position, the Williams relied primarily on *Rummage v. State ex rel. Department of Transportation,* 1993 OK CIV APP 39, ¶ 16, 849 P.2d 1109, 1112, where we held:

It is well established that condemnation proceedings, initiated for the purpose of exercising the sovereign right of eminent domain (footnote omitted), are special statutory proceedings (footnote omitted) and are to be carried out in accordance with the specific procedures prescribed by the Legislature. (Citation omitted.)

An inverse condemnation action is similarly statutory, with constitutional origins. Section 24, Article II of the Oklahoma Constitution provides that:

Private property shall not be taken or damaged for public use without just compensation....

This constitutional provision also mandates procedures for determining compensation of such private property owners. The procedures have been codified and expanded at 66 O.S.1991 § 51 et seq. (Footnote omitted.) Section 57 of Title 66 contains a proviso clause which makes procedures contained in that chapter applicable where an entity authorized to exercise the right of eminent domain:

... shall have *taken and occupied,* for purposes for which it might have resorted to condemnation proceedings, ..., any land, without having purchased or condemned the same, ... (emphasis added). (Footnote omitted.)

We therefore find the procedures for an inverse condemnation action to be the same as those for eminent domain condemnation in accordance with 66 O.S.1991 §§ 51 et seq.

1993 OK CIV APP 39, ¶ 16, 849 P.2d at 1112. Finding the procedures to be identical, *Rummage* then refers to a condemnation case,

Board of County Commissioners of Creek County v. Casteel, 1974 OK 31, 522 P.2d 608, for the proposition that there are only three pleadings authorized by statute in condemnation proceedings: the petition, an objection to the report of the commissioners, and a demand for jury trial. The Supreme Court essentially so concluded in an earlier reverse condemnation case. *Incorporated Town of Pittsburg v. Cochrane,* 1948 OK 121, 200 Okla. 497, 197 P.2d 287.

¶ 6 Consequently, argued the Williams, in any condemnation case, regular or inverse, failure to object to the commissioners' report or demand a jury trial requires the trial court to enter judgment based upon the commissioners' report:

The report, if allowed to stand without objection, serves to pass the use or title condemned. Though the report is not the pronouncement of a judicial body or tribunal, it has the force and effect of a judgment in such case under the statute.

*Harn v. State ex rel. Williamson,* 1939 OK 40, 184 Okla. 306, 87 P.2d 127, 129. This is true, said the Williams, even though the landowner may have previously, as here, filed a demand for a jury trial then subsequently withdrawn it; the opponent, having failed to request a jury trial, could not rely on landowner's earlier request, now withdrawn:

The defendants had no right to base their demand for a jury to determine the sufficiency of this compensation upon the plaintiff's demand for a jury. The fair inference is that defendants were satisfied with the award of the commissioners, and, when defendants filed no demand for a jury, plaintiff should have been permitted at any stage of the proceedings before a final submission of the same to a jury to waive her demand for a trial by the jury, to dismiss her demand for a trial by jury on the question of the insufficiency of said compensation, and to accept the award of the commissioners.

*Short v. State Highway Commission,* 1931 OK 352, 151 Okla. 85, 1 P.2d 676, 677.

---

4. This useful distinction between regular and reverse condemnation proceedings was used by the court in *Allen v. Transok,* 1976 OK 53, 552 P.2d 375.

¶ 7 Therefore, argued the Williams, since procedures are identical in regular and inverse condemnation proceedings, and since ODOT had filed neither objections to the commissioners' reports, nor a jury trial demand, the trial court could *only* enter judgment for the Williams pursuant to the commissioners' reports determining damages.

¶ 8 ODOT's view of the law was considerably different. ODOT argued that regular and inverse condemnations are inherently different, and necessarily have different procedures. First, said ODOT, while both regular and inverse condemnation claims involve the question of amount of damages, inverse condemnation uniquely requires a determination of whether a taking has occurred. That is, ODOT pointed out, in regular condemnation proceedings, the question of a taking is a given, but whether there has been a taking is always a critical issue in inverse condemnation proceedings, and must be determined by a jury. *Carter v. City of Oklahoma City,* 1993 OK 134, ¶ 15, 862 P.2d 77, 81; *Richardson v. State, ex rel. Department of Transportation,* 1991 OK CIV APP 100, 818 P.2d 1257. The Oklahoma Supreme Court has indeed held that the question of a "taking in inverse condemnation under Article 2, § 24 of the Oklahoma Constitution, is for the jury." *See, e.g., Henthorn v. Oklahoma City,* 1969 OK 76, ¶ 14, 453 P.2d 1013, 1016.

¶ 9 In addition to an absolute right to a jury trial, ODOT pointed to other differences in procedures between regular and inverse condemnation. In *Carter,* the Supreme Court said that, unlike in regular condemnation proceedings "it is not critical that commissioners be appointed in an action for inverse condemnation." 1993 OK 134, ¶ 15, 862 P.2d at 81. "It is therefore not necessary that commissioners be appointed in an action for inverse condemnation." *Richardson,* 1991 OK CIV APP 100, ¶ ——, 818 P.2d at 1258. Accordingly, maintained ODOT, because it is not necessary to appoint commissioners in inverse condemnation actions, and because the taking question is always for the

jury, whether ODOT complied with the procedures prescribed by 66 O.S. § 55 or not, ODOT nevertheless had a right to jury trial and the trial court could not grant judgment to the Williams absent jury trial on the taking issue.

¶ 10 The trial court agreed with the Williams. ODOT moved for reconsideration, which the trial court denied.

### III. Issues

¶ 11 ODOT now appeals, arguing that procedures in regular condemnation differ from inverse condemnation cases, and consequently there *must* be a determination of a taking by a jury. We therefore are confronted with these issues:

1) whether a right to a jury trial exists in inverse condemnation if statutory procedures in 66 O.S. §§ 51 et seq. are not followed;

and

2) does failure to object to the commissioners' report or demand a jury trial waive the right to a determination of a taking.

¶ 12 We first hold the right to jury trial in inverse condemnation cases is invoked only by following the statutory procedures in 66 O.S. § 51 et seq. However, we further hold failure to comply with the statutory procedure does not waive the right to a judicial determination of the issue of a taking.

### IV. Development of the Law of Inverse/Reverse Condemnation

■ ¶ 13 The power to take private property for the public good is a fundamental attribute of a sovereign state.[5] The state may delegate this power to local municipalities, to private persons or to corporations authorized to exercise functions of a public character.[6] This right, which since the 17th Century has been known as eminent domain,[7] does not arise from a constitutional grant of power; rather, constitutional provisions serve as lim-

---

5. *Harn v. State ex rel. Williamson,* 1939 OK 40, 184 Okla. 306, 87 P.2d 127, 129.

6. *United States v. Jones,* 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015 (1883).

7. Henry H. Foster, Jr., "Tort Liability Under Damage Clauses," 5 Ok. L.Rev. 1, 3 (1952).

itations on that power.[8] The Oklahoma Constitution, Art. 2, § 24, limits this right by requiring payment of "just compensation" for property taken and used for the public good.

¶ 14 Moreover, the required payment of "just compensation" is not limited to property "taken," but extends also to property "damaged." It is in the evolving nature of the definition of property "taken" and "damaged"—and by what procedure these issues should be determined—that the courts have fashioned a legal remedy, now known as inverse condemnation, to ease the burden on affected landowners in the never-ending conflict between property owners and the public concerning who will pay the costs of public improvements.

██ ¶ 15 While eminent domain generally refers to legal proceedings in which the state or other authorized entity asserts its authority to condemn property for public use, inverse condemnation represents merely a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Stewart v. Rood,* 1990 OK 69, ¶ 38, 796 P.2d 321, 335, fn. 32; *Brannon v. City of Tulsa,* 1996 OK CIV APP 145, ¶ 6, 932 P.2d 44, 46.

¶ 16 The roots of inverse condemnation go back to the mid-nineteenth century. Originally, the Constitution of the United States and most states of the union provided for just compensation only when property was "taken," but made no provision for compensation when property had merely been "damaged." As the Oklahoma Supreme Court early observed:

> A review of the authorities ... construing the various constitutional and legislative provisions, reveals that three conditions are presented: First, cases where private property is taken for public use; second, where a part of a tract is taken and the residue of the tract suffers a direct physical damage as a result of the taking

of a part; and, third, where a property, no part of which was taken for public use, sustains a consequential damage by reason of the making of a public improvement. *State Highway Commission v. Smith,* 1930 OK 480, 146 Okla. 243, 293 P. 1002, 1003.

¶ 17 The injustice of denying recovery to landowners falling in the last class was generally recognized, and as a result, many constitutional and statutory provisions were changed across the country to provide for just compensation in cases of both property "taken" and property "damaged."[9] These changes began to occur around 1870[10] and today there are twenty-two states whose constitutions specifically include a "damaged" clause.[11] The inclusion of such a clause in the Oklahoma Constitution "was due to the opinion of its makers that the consequential damage resulting from public improvements on other land should be compensated." *Smith,* 293 P. at 1003. That is, "the introduction of the word 'damaged' into that clause of the Constitution indicated a deliberate purpose to abolish the old test of direct physical injury to the property affected." *Oklahoma City v. Vetter,* 1919 OK 48, 72 Okla. 196, 179 P. 473, 474.

¶ 18 The just compensation clause of the Oklahoma Constitution thus protected property, not actually taken, but consequentially damaged. And the early cases vigorously enforced the just compensation mandate: "Whatever may be the reasons in other jurisdictions for denying a recovery, unless there has been a physical invasion of the property damaged, they can have no place under a Constitution guaranteeing to property owners the right to a just compensation for private property damaged for public use." *City of Muskogee v. Hancock,* 1916 OK 598, 58 Okla. 1, 158 P. 622, 626.

¶ 19 Prior to 1930, Oklahoma law recognized the proper procedure to recover for inverse condemnation was in a common law damage action, the court having specifically rejected eminent domain as the proper pro-

---

**8.** *Kelly v. Ok. Turnpike Auth.,* 1954 OK 112, 269 P.2d 359.

**9.** *Smith,* 293 P. at 1003.

**10.** *Oklahoma City v. Vetter,* 1919 OK 48, 72 Okla. 196, 179 P. 473, 474.

**11.** 5 Ok. L.Rev. at 6.

cedure.[12] In order to prevail, a landowner had to prove two elements: (1) an entity exercising the power of eminent domain engaged in conduct on or near adjoining property, damaging the plaintiff's property, and (2) the amount of just compensation. Just as in any damage suit, the burden fell on plaintiff to prove his allegations.

¶ 20 In 1930, the Supreme Court held in *State Highway Commission v. Smith, supra*, that a landowner could, under the Oklahoma Constitution and statutes, maintain an eminent domain action against the state for recovery of consequential damages. The Supreme Court reasoned that since Article 2, § 24 of the Constitution provided just compensation for damages, and since the Constitution "provides that such compensation ... be ascertained by a board of commissioners of not less than three freeholders *in such manner as may be prescribed by law*," and since the legislature had in fact prescribed procedures for determining compensation, the eminent domain procedures were the procedures to be followed. *Smith*, 293 P. at 1003. (Emphasis added.) The Supreme Court reiterated this concept five years later. *See also, Stedman v. Highway Commission*, 1935 OK 1028, 174 Okla. 308, 50 P.2d 657.

¶ 21 In 1936, the Supreme Court reversed itself and held that an eminent domain proceeding brought by a landowner against the State, for purposes of recovering consequential damages, would not lie. *State Highway Commission v. Brixey*, 1936 OK 595, 178 Okla. 118, 61 P.2d 1114. In *Brixey*, the landowner alleged damage to his property and business by *flooding* attributable to the construction of an adjoining highway. The Supreme Court held Brixey's action constituted nothing more or "less than an action for consequential damages," prohibited by sovereign immunity. The court reasoned that while an eminent domain action by the landowner would be proper if the State had originally *taken and occupied* the land without maintaining condemnation proceedings, absent such a taking and occupation, the landowner's only recourse would be a common law damage suit, which was prohibited against the state by sovereign immunity.[13]

¶ 22 The distinction between property actually taken and property consequentially damaged, as well as the proper remedial framework, whether in eminent domain or by a common law damage action, began to melt. In *Henthorn v. Oklahoma City*, 1969 OK 76, 453 P.2d 1013, an inverse condemnation action, the court was required to determine "whether there was an interference with the use and enjoyment of the property due to the noise the jets made in landing and taking off for Will Rogers Airport and the amount of damages suffered." The Supreme Court held:

> It is generally conceded that there is a legal right to the use and enjoyment of one's property free from unreasonable interference. The ultimate question is whether there is a sufficient interference with the landowner's use and enjoyment to constitute a taking by a sovereign ... [and] [t]he question of substantial interference is one that the trier of the facts must decide.

*Henthorn*, 1969 OK 76, ¶ 14, 453 P.2d at 1015, 1016.

¶ 23 In 1975, the Supreme Court decided *State ex rel. Department of Highways v. Cook*, 1975 OK 153, 542 P.2d 1405. There, the Court held that a taking could be demonstrated by showing an overt act leading to exercise of dominion and control over property.

¶ 24 An eminent domain "taking" now meant (a) taken and occupied, (b) substantial interference with use and enjoyment, or (c) an overt act exercising dominion and control. Once this happened, the distinction between what was a taking and what was consequential damage became unimportant for pur-

---

12. *Edwards v. Thrash*, 1910 OK 177, 26 Okla. 472, 109 P. 832.

13. Not only was eminent domain not the proper procedure against the state, but it could not be used in actions against railroad companies or cities if plaintiff sought damages to property when no part of property had been taken and occupied for public use. *Chicago, R.I. & P. Ry. Co. v. Jennings*, 1936 OK 45, 175 Okla. 524, 53 P.2d 691. The property owner would have to bring a common law action for damages, and this legal framework persisted for many years.

poses of bringing an inverse condemnation case. Since questions of substantial interference and overt acts were to be decided by a trier of fact as long as a "taking" was alleged, inverse condemnation would be the proper procedure.

¶ 25 Illustrating the obliteration of the difference between taking and consequential damage, is *State ex rel. Department of Transportation v. Hoebel,* 1979 OK 63, 594 P.2d 1213 and *Mattoon v. City of Norman,* 1980 OK 137, 617 P.2d 1347. *Flooding* could now constitute a taking when 44 years before in *Brixey,* flooding was regarded as merely consequential damage, outside the scope of eminent domain.

### V. The Problem

¶ 26 Regular condemnation proceedings are governed by *legislatively* prescribed procedures which are ordinarily designed to resolve only the issue of just compensation.[14] These procedures are not designed to deal with whether there has been a taking since an actual taking must occur before the process can begin.[15]

¶ 27 The procedures for inverse condemnation have been established by the *courts,* not the legislature. Although there are limited references in the statutes to reverse or inverse condemnation, none define the cause of action nor create procedures to be followed.[16] Often courts refer to 66 O.S. § 57 as legislative authorization for inverse condemnation proceedings as the court did in *Rummage.* A good example is *Drabek v. City of Norman,* 1996 OK 126, 946 P.2d 658, 660 (1997) where the court said:

> Statutory authority for inverse condemnation is found at 66 O.S.1991 § 57:

... Provided, that in case any corporation or municipality authorized to exercise the right of eminent domain shall have taken and occupied, for purposes for which it might have resorted to condemnation proceedings, as provided in this article, any land, without having purchased or condemned the same, the damage thereby inflicted upon the owner of such land shall be determined in the manner provided in this article for condemnation proceedings.

1996 OK.126, ¶ 4, 946 P.2d at 660.

¶ 28 This statement is only partly true. Section 57 is not legislative authority for bringing an inverse condemnation action for a taking as that term is used today. That statute, included in the original 1910 session laws and carried forward until now, was written at a time when a taking only referred to land *actually taken.*

¶ 29 Section 57 specifically applies only where property is "taken and occupied." Its purpose was to deal with factual situations like those found in *Allen v. Transok,* 1976 OK 53, 552 P.2d 375. There, an entity having the power of eminent domain constructed a pipeline across property without having obtained an easement or instituting condemnation proceedings, and § 57 authorizes inverse condemnation when this type of taking, i.e., an actual physical invasion of property, occurs.

¶ 30 The significance, of course, is that in this § 57 authorized situation no issue of *whether* there was a taking arises. By definition, a taking requires property to be "occupied" — a physical invasion. Moreover, even if § 57 amounted to legislative authorization for a modern day inverse condemnation action in a situation where no *actual*

---

**14.** Occasionally there may also be questions involving necessity of taking and whether the taking is for public or private use.

**15.** There is nothing in the appointment of commissioners, nor in the filing of their report, which sheds any light on the issue of a taking, and it is in this vein that the courts in *Richardson* and *Carter* referred to appointment of commissioners as "irrelevant" or "unnecessary" to the taking determination. To suggest, as ODOT does, that this indicates different procedures for regular and inverse condemnation is to ignore the context in which the courts made these state-

ments, as well as the specific language of Art. 2, § 24 of the Constitution which mandates appointment of commissioners to determine damages, a determination which must be made in both regular and inverse condemnation proceedings.

**16.** For instance, 69 O.S. § 1705 grants the Oklahoma Turnpike Authority the right to sue or be sued in reverse condemnation, while 27 O.S. § 12 provides for attorney fees and costs if an inverse action is successful.

taking had occurred, it would only apply to establishing procedures for determining damages, not a taking, because § 57 specifically provides "the *damages* thereby inflicted upon the owner of such land shall be determined in the manner provided in this article for condemnation proceedings."

¶ 31 It is the court and not the legislature that authorized inverse condemnation actions in situations without an *actual taking*, but a taking as that term was used in Henthorn and Cook, and as there used, absent an actual taking, the question of whether a taking had occurred indeed became critical. In citing § 57 as authority, it is as though the courts changed the threshold requirements of 66 O.S. § 57 from "taken and occupied" to "taken or damaged."

¶ 32 Having authorized eminent domain actions when there had been no actual taking, the courts necessarily incorporated the legislatively authorized procedures for determining damages, and then grafted onto the jury's constitutional and statutory duty to determine compensation the task of determining the issue of a taking. *Henthorn,* 1969 OK 76, ¶ 14, 453 P.2d at 1015–1016; *Hoebel,* 1979 OK 63, ¶ 10, 594 P.2d at 1213, *Oxley v. City of Tulsa,* 1989 OK 166, ¶ 15, 794 P.2d 742, 745.

¶ 33 This case however illustrates that this incorporation has not been completely successful. Having given the determination of a taking to the jury empaneled to decide damages, how does that issue reach a jury, if for whatever reason, the entity being sued does not demand a jury trial to contest the commissioners' award?

■ ¶ 34 There exists no right to a jury trial in condemnation actions, absent the constitutional and statutory provisions found in Article 2 § 24 of the Oklahoma Constitution and 66 O.S. § 55. This right—more correctly the right to demand a jury trial—is specifically authorized only to determine "amount of damages." 66 O.S. § 55. The only way to invoke this right is through the procedures contained in 66 O.S. § 51 et seq. Indeed, the trial court has no authority to order a jury trial in the absence of an objection to the appraisers' report or other demand therefore. *State, ex rel. Department of Highways*

*v. Brown,* 1969 OK 198, ¶¶ 19–20, 462 P.2d 261, 266, cert. denied 397 U.S. 991, 90 S.Ct. 1125, 25 L.Ed.2d 398 (1970), rehearing denied 397 U.S. 1081, 90 S.Ct. 1520, 25 L.Ed.2d 819 (1970). And even though, as here, one party had originally demanded a jury trial, such demand may be withdrawn. *Western Farmer Electric Cooperative v. Rowlett,* 1955 OK 254, 288 P.2d 726. Either failure to demand a jury or withdrawal of a previous demand creates a fair inference that parties are satisfied with the commissioner's award. *Short,* 1931 OK 352, 1 P.2d at 677.

¶ 35 In considering statements by courts that the taking issue must be determined by a jury—rather than creating some new right to a jury trial—we view such statements as merely shorthand for the requirement that the taking issue is to be submitted to the trier of fact. *See, e.g., Henthorn,* 1969 OK 76, ¶ 14, 453 P.2d at 1016; *Mattoon,* 1980 OK 137, ¶ 10, 617 P.2d at 1349; *Oxley,* 1989 OK 166, ¶ 15, 794 P.2d at 746. While juries have been allowed to make factual determinations regarding a taking, the Supreme Court has spelled out the proper function of the jury is in "making the factual findings [of a substantial interference] which must necessarily precede the legal conclusion" *by the court* of a compensable taking. *Oxley,* 1989 OK 166, ¶ 15, 794 P.2d at 746.

■ ¶ 36 Stated otherwise, whether a jury is empaneled to determine damages or not, a determination must be made on a taking. We so hold because, first, Article 2 § 24 requires a "judicial determination" of the character of the use, which must, in our view, necessarily include a determination of a "taking," since, without a taking, there is no necessity for the determination of the character of the use. Second, the determination of a taking must be made by the trier of fact and is not susceptible to summary disposition in inverse condemnation actions. *Oxley,* 1989 OK 166, ¶ 15, 794 P.2d at 746 (where evidence presented arguably supports finding of compensable taking, directed verdict properly denied); *Mattoon,* 1980 OK 137, ¶ 10, 617 P.2d at 1349 (petition alleging compensable taking not demurrable). Otherwise, a judgment could be entered solely on an *alle-*

*gation* of a taking without presentation of evidence of a taking in contradiction of the rule that a plaintiff in an inverse condemnation action bears the burden of proof on all issues "that lie at the foundation of the ... proceedings." *Cochrane*, 1948 OK 121, ¶ 0, 197 P.2d at 288 (Court's syllabus).

### V. Conclusion

■ ¶ 37 We conclude that if a timely demand for jury trial has been filed, then the taking issue is properly submitted to the jury for a factual determination along with the damages issue. If, however, there has been no timely jury trial demand, the damage issue has been confessed. But the taking issue, if raised by the defendant as was done here, must still be decided by the only remaining trier of fact, i.e. the court, as arbiter of both the facts and the law. Failure to demand a jury trial only means damages have been determined in the amount of the commissioners award, while leaving the taking issue for determination by the court as trier of fact.

### VI. Application to the Case at Bar

¶ 38 The trial court erred in summarily granting judgment to the Williams based on the commissioners' reports. That is, the report of the commissioners established the damage to the Williams' property in the amount of $120,000.00, and that determination is now final. When ODOT failed to timely object to the commissioners' report, or demand a jury trial, it did not properly invoke the right to jury trial on any issue.

Nevertheless, ODOT was still entitled to a factual determination of a compensable taking, thereby requiring a determination thereof by the court in this case as arbiter of both the facts and the law. The order of the trial court granting judgment to the Williams is therefore REVERSED, and the cause REMANDED for further proceedings.

¶ 39 BUETTNER, P.J., concurs;

GARRETT, J., concurs in part; dissents in part:

¶ 1 I agree with all of this opinion, except the reversal and remand to determine whether there was a taking.

¶ 2 ODOT did not make an issue as to "taking" before the trial court. Since the statutory rules relating to eminent domain apply as far as they go, and since there are no statutes prescribing the procedure to follow to present the issue as to the existence of a taking in a reverse condemnation case, the pleading code applies.

¶ 3 ODOT's failure to deny the existence of the taking as alleged by Landowners constitutes a confession by ODOT that there was a taking. In addition, I would sustain Landowners request for appellate attorney fees. I respectfully dissent.