2015 OK CIV APP 12

Robert and Brenda PERRY, David and Stacy Pryor, and John and Janet Shaw, Plaintiffs/Appellees; Counter–Appellants,

and

Robert Asbell and Teresa Asbell, et al., Plaintiffs,

v.

GRAND RIVER DAM AUTHORITY, Defendant/Appellant; Counter–Appellee.

Nos. 109,714, 109,715 and 109,716.

Court of Civil Appeals of Oklahoma, Division No. IV.

Dec. 31, 2013.

Certiorari Denied Nov. 17, 2014.

N. Larry Bork, Mary E. Christopher, Goodell, Stratton, Edmonds & Palmer, L.L.P., Topeka, Kansas, and Scott R. Rowland, Renee DeMoss, Gable Gotwals, Tulsa, Oklahoma, for Plaintiffs/Appellees.

Joseph R. Farris, Belinda Aguilar, Millicent L. Hughes, Feldman, Franden, Woodward, Farris & Boudreaux, Tulsa, Oklahoma, and Phil R. Richards, Whitney R. Mauldin, Randy Lewin, Richards & Connor, Tulsa, Oklahoma, for Defendant/Appellant.

JERRY L. GOODMAN, Judge.

¶1 Grand River Dam Authority (GRDA) appeals the trial court's orders awarding damages in inverse condemnation to Robert and Brenda Perry (Perrys), David and Stacy Pryor (Pryors), and John D. and Janet M. Shaw (Shaws). Perrys, Pryors, and Shaws counter-appeal the court's ruling denying their request for damages for personal property.[1]

## FACTS

¶2 The Grand River Dam Authority (GRDA) was created by the State of Oklahoma for the purpose of constructing the Pensacola Dam on the Grand River to create the Grand Lake O' the Cherokees (Grand Lake) which is an impoundment of waters flowing from the Neosho and Spring Rivers and their tributaries into Grand River. The dam and resulting lake provide flood control, electricity, water, recreation, and irrigation for the affected watersheds. GRDA is regulated by the Federal Energy Regulatory Commission (FERC) and from its inception has possessed the power of eminent domain. Pursuant to this power, GRDA obtained flowage easements on real property to an elevation of 760 feet NGVD, an elevation related to sea level.[2]

¶3 Perrys, Pryors, and Shaws (collectively "Landowners") own real property above 760 feet NGVD on Grand Lake. In October 1986 (1986 flood), Shaws' property sustained flooding.[3] Subsequently, Perrys, Pryors, and Shaws' properties flooded in September 1993 (1993 flood), April 1994 (1994 flood), and June 1995 (1995 flood). On October 5, 2001, Perrys, Pryors, and Shaws, as well as a number of other landowners, filed suit against GRDA for inverse condemnation.[4] GRDA denied any taking had occurred.

¶4 GRDA subsequently filed a motion for summary judgment, asserting Landowners' claims for damage to real and personal property were time-barred by 12 O.S.2011, § 95. Landowners disagreed, asserting issues of limitations, damages and causation had been resolved in *Dalrymple, et al. v. Grand River Dam Authority*, CJ–94–444 (*Dalrymple*), wherein 100 landowners filed suit against GRDA for injury to their property resulting from flooding from the Pensacola Dam. Therein, the trial court adopted the findings of the court appointed referee, hydrologist Dr. Forrest Holly, Jr., who determined, *inter alia*, that "the existence and operation of Pensacola Dam caused a quantifiable increase in the magnitude and duration of flooding above 760 feet NGVD...." (Holly Report.) In the present case, the trial court adopted the Holly Report, finding the same recurring floods at issue in *Dalrymple* are at issue in the present case.

¶5 On May 14, 2010, the trial court granted GRDA partial summary judgment, finding Landowners' personal property claims were time-barred by 12 O.S.2011, § 95(A)(3). Subsequently, by order filed on June 28, 2011, the court made separate findings of fact as to each Landowner's inverse condemnation claim.

With respect to the Perrys, the court found:

1. By order dated August 15, 2011, the Oklahoma Supreme Court ordered Appeal Nos. 109,714, 109,715, and 109,716 consolidated under surviving Appeal No. 109,714. In addition, this Court declines to strike the amended designation of record.

2. A flowage easement permits GRDA to flood privately-owned property, if necessary, for the operation of the project.

3. Pryors' property also sustained flooding in 1986, although they were not the owners of the property. Apparently, the previous owner abandoned the property after the 1986 flood.

4. Perrys, Pryors, and Shaws' claims were severed for procedural reasons and are the only landowners involved in the current appeal.

- The property was subject to flooding in 1993, 1994, and 1995. All of the flooding above 760 feet NGVD was caused by the existence and operation of the GRDA Dam. After each flood, Perrys cleaned and restored their residence. Perrys sold the property in 2001.

- GRDA interfered with the use and enjoyment of the property and thereby took a flowage easement upon all of the Perrys' property to an elevation of 771 feet NGVD. The court established the date of taking as April 7, 1994, finding the 1994 flood reached the highest elevation. The court awarded just compensation of $32,990.00 for diminution in value, restoration costs as to all floods, and for the flowage easement taken.

With respect to the Pryors, the court found:

- The property was subject to flooding in 1993, 1994, and 1995. All of the flooding was caused by the existence and operation of the GRDA Dam. On each occasion, Pryors cleaned and restored their property.

- The property also flooded in 1986 to a depth of five feet. The court accepted the Mussetter Report, which attributed three and one-half feet of that flood to natural causes and the balance to the GRDA Dam operation.[5] However, Pryors did not acquire the property until 1989. Pryors sold the property in 2005.

- A temporary taking from 1993 to 1995 and awarded just compensation of $60,850.00 for restoration costs and diminution in value of the property.

For the Shaws, the trial court found:

- The property was subject to flooding in 1993, 1994, and 1995, and the flooding was caused by the existence and operation of the GRDA Dam. The property was also flooded in 1986 to a depth of four feet. The court accepted the Mussetter Report, which found 50% of the flooding was due to natural causes and 50% to the GRDA Dam operation.

- Shaws' restored their property after each flood. However, after the 1995 flood, the Shaws abandoned the property, retaining title to the property.

- A fee title was taken on June 2, 1995, and awarded just compensation of $114,850.00 for restoration costs and diminution in value of the property.

¶ 6 GRDA appeals the judgments awarding Landowners damages of just compensation. Landowners counter-appeal the court's ruling that their personal property claims were barred by the two-year statute of limitations under 12 O.S.2011, § 95(3).

## STANDARD OF REVIEW

¶ 7 In inverse condemnation cases, whether there is a taking and the amount of damages are questions of fact for the trier of fact. Therefore, the judgment of taking and amount of damages will be affirmed if supported by any competent evidence. *Material Serv. Corp. v. Rogers Cty. Bd. of Comm'rs*, 2012 OK CIV APP 17, ¶ 5, 273 P.3d 880, 883.

## ANALYSIS AND REVIEW

### A. Condemnation

¶ 8 Condemnation, also known as eminent domain, is the power to take private property for the public good. *Williams v. State ex rel. Dept. of Transp.*, 2000 OK CIV APP 19, ¶ 13, 998 P.2d 1245, 1248 (citing *Harn v. State ex rel. Williamson*, 1939 OK 40, 184 Okla. 306, 87 P.2d 127). The right of condemnation is a fundamental attribute of the sovereign state. *City of Tahlequah v. Lake Region Elec., Co-op., Inc.*, 2002 OK 2, ¶ 7, 47 P.3d 467, 471. Eminent domain generally refers to legal proceedings in which the state or other authorized entity asserts its authority to condemn property for public use. *Williams*, 2000 OK CIV APP 19, at ¶ 15, 998 P.2d at 1249. Conversely, "[i]nverse condemnation is an action brought by a property owner seeking just compensation for land taken for a public use, against a government or private entity having the power of eminent domain. It is a remedy peculiar to the property owner and is exercisable by him where the taker of the property does not bring eminent domain proceedings."

---

5. Dr. Robert A. Mussetter was another expert in the *Dalrymple* case.

*Drabek v. City of Norman*, 1996 OK 126, ¶ 4, 946 P.2d 658, 659 (citing *Black's Law Dictionary* 825 (6th Ed.1990)).

¶ 9 In the present case, Landowners filed an inverse condemnation proceeding against GRDA asserting a series of floods resulted in a taking of their private properties without just compensation in violation of Oklahoma Constitution, Article II, § 24. Article II, § 24 provides, in relevant part:

> Private property shall not be taken or damaged for public use without just compensation. Just compensation shall mean the value of the property taken, and in addition, any injury to any part of the property not taken. . . .

Landowners contend the trial court's finding of a taking and the determination of the date of taking should not be disturbed on appeal as there is competent evidence to support the court's findings.

¶ 10 GRDA disagrees, contending originally on appeal that: 1) the intermittent flowage of water for temporary periods of time on Landowners' properties cannot be considered a taking,[6] and 2) the undisputed facts show the Shaws and Pryors' properties were flooded and taken by naturally-occurring floods, not flooding resulting from the operation of the Dam.[7] At oral arguments held on July 10, 2013, however, GRDA conceded a taking of Landowners' properties for purposes of inverse condemnation had occurred.[8] GRDA asserted that for the Shaws and Pryors, a taking occurred in 1986, and for the Perrys, a taking occurred in 1993.[9]

¶ 11 Article II, Section 24 of the Oklahoma Constitution does not define what actions constitute a taking. Case law has found a taking where land is physically taken and occupied, where government action substantially interferes with the use and enjoyment of property, or where government overtly exercises dominion and control over property. *Material Serv. Corp.*, 2012 OK CIV APP 17, at ¶ 5, 273 P.3d at 883. "The ultimate question is whether there is a sufficient interference with the landowner's use and enjoyment to constitute a taking by a sovereign." *Henthorn v. Oklahoma City*, 1969 OK 76, ¶ 10, 453 P.2d 1013, 1015. The sufficiency of interference is equated to "substantial" interference. *State ex rel. Dept. of Transp. v. Hoebel*, 1979 OK 63, ¶¶ 9–10, 594 P.2d 1213, 1215. Moreover, the trier of fact decides the question of substantial interference. *Henthorn*, 1969 OK 76, at ¶ 15, 453 P.2d at 1016; *Mattoon v. City of Norman*, 1980 OK 137, ¶ 11, 617 P.2d 1347, 1349. Conversely, "[a]cts done in the proper exercise of the police power which merely impair the use (or value) of property do not constitute a 'taking.'" *April v. City of Broken Arrow*, 1989 OK 70, ¶ 14, 775 P.2d 1347, 1351.

¶ 12 With respect to flooding, the Oklahoma Supreme Court has held that continual flooding caused by the construction of a public highway, if serious enough to constitute substantial interference with the use and enjoyment of the property, may constitute a taking. *Hoebel*, 1979 OK 63, at ¶ 10, 594 P.2d at 1215. The majority rule is that flooding may constitute a taking if the flooding is severe enough so as to effectively destroy or impair the land's usefulness. *Id.* at ¶ 8, 594 P.2d at 1215 (citing 2 Nichols on *Eminent Domain*, § 6.23(3), and 26 Am.

---

**6.** GRDA asserted no taking occurred because Landowners restored and returned to their homes and continued to live on the property. Thus, the properties usefulness was not destroyed or seriously or substantially impaired to the point Landowners could not exercise dominion and control.

**7.** For example, GRDA asserted a taking of the Shaws' property did not occur because the property was flooded by four feet of water in 1986 and 50% of this was due to naturally-occurring flooding. Thus, the additional flooding caused by GRDA's operation of the dam affected a house already flooded and "taken" by naturally-occurring flooding.

**8.** This Court granted GRDA's motion for oral arguments by order dated June 3, 2013.

**9.** GRDA's concession, rejected by Landowners, is only a statement against interest. Its concession cannot usurp the functions of the court to decide questions of law and the trier of fact to decide issues of fact. In inverse condemnation proceedings, whether there is a sufficient interference with the landowner's use and enjoyment to constitute a taking, and the date of taking, is a question of fact for the trier of fact. See *Henthorn v. Oklahoma City*, 1969 OK 76, 453 P.2d 1013.

Jur.2d, *Eminent Domain*, § 65). See also *Henthorn*, 1969 OK 76, 453 P.2d 1013 (Syl.2)(holding frequent aircraft flights over a landowner's property may constitute a taking). "Ordinarily, the question of whether a continuing interference is substantial enough to constitute a 'taking' under Section 24, Art. 2, Constitution, is one for the jury." *Id.*

¶ 13 The U.S. Supreme Court recently reiterated requirements for determining whether there has been a taking under the Fifth Amendment to the U.S. Constitution in *Arkansas Game and Fish Comm'n v. U.S.*, —— U.S. ——, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012). The Court noted "[t]he Takings Clause is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* at 518 (quoting *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). In addition, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Id.* (quoting *Tahoe–Sierra Preserv. Council, Inc. v. Tahoe Reg. Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)).

¶ 14 The issue in *Arkansas Game and Fish* was "whether government actions that cause repeated floodings must be permanent or inevitably recurring to constitute a taking of property." *Id.* at 518. The Court concluded that government-induced "recurrent floodings, even if of a finite duration, are not categorically exempt from Takings Clause liability." *Id.* at 515. The temporary nature of the flooding did not automatically exclude it from being a compensable event under the Takings Clause. While time or duration was the relevant factor in determining the existence of a compensable taking, the Court held "[a]lso relevant to the takings inquiry is

the degree to which the invasion is intended or is the foreseeable result of authorized government action." *Id.* at 522. Thus, the duration of a physical invasion is not determinative of whether or not the government may be held liable for a taking. Regardless of whether the invasion is temporary or permanent, takings liability under the Takings Clause can attach to any federal government action that constitutes a substantial interference with the use and enjoyment of the property. Although not controlling, we find *Arkansas Game and Fish* persuasive.[10]

¶ 15 The majority rule in this country is that flooding may constitute a taking if the flooding is severe enough so as to effectively destroy or impair the land's usefulness. See *Hoebel*, 1979 OK 63, ¶ 8, 594 P.2d at 1215. In the present case, Landowners' properties were subject to a series of recurring floods in varying degrees in 1986, 1993, 1994, and/or 1995. The trial court found the floods were caused by the existence and operation of the Pensacola Dam and that the floods constituted a sufficient interference with Landowners' use and enjoyment of their properties to constitute a taking. Based on our review of the record, we find competent evidence from which the trial court, as the trier of fact, could conclude that a taking of Landowners' properties has occurred.

### 1. Date of Taking and Interest Taken

¶ 16 The date of taking establishes not only the date of transfer, but also the date on which just compensation is to be determined. The date of taking in a condemnation case is the date when the condemnor pays the amount of the commissioners' award into court. *State ex rel. Dept. of Transp. v. Post*, 2005 OK 69, ¶ 9, 125 P.3d 1183, 1186–87. Unless a party makes a timely request for a jury trial, the commissioners' report

---

10. The parties dispute the applicability of *Arkansas Game and Fish* to the present case. GRDA asserts it is inapplicable because a permanent condition exists in the present case that will inevitably recur. Landowners disagree, asserting the case supports its positions of multiple temporary takings. GRDA further asserts the federal and state takings clauses are distinct as held in *Board of Cty. Comm'rs of Muskogee Cty. v. Lowery*, 2006 OK 31, 136 P.3d 639. In *Lowery*,

the Oklahoma Supreme Court held the Oklahoma Constitution provides private property protection to Oklahoma citizens beyond that which is afforded them by the Fifth Amendment to the U.S. Constitution. Thus, Oklahoma's constitutional eminent domain provisions place more stringent limitations on governmental eminent domain power than the limitations imposed by the Fifth Amendment to the U.S. Constitution. *Lowery* did not hold as GRDA asserts.

establishes compensation. Conversely, in an inverse condemnation proceeding, the commissioners' report serves no purpose and just compensation, along with whether and the date a taking has occurred, are questions of fact for the trier of fact. *Id.* at ¶ 7, 125 P.3d at 1186.[11]

¶ 17 At oral arguments, GRDA asserted the Shaws and Pryors' date of taking was the 1986 flood and the Perrys' date of taking was the 1993 flood.[12] GRDA maintains the taking occurred upon the first substantial governmental interference with the properties and that any subsequent damage to the properties simply constitutes further evidence that the governmental interference was indeed substantial. GRDA contends there is only a single, permanent taking for each Landowner because the need for the properties has not ceased as flooding will inevitably recur again, citing *Perkins Whistlestop, Inc. v. State ex rel. Dept. of Transp.,* 1998 OK CIV APP 7, ¶ 7, n. 4, 954 P.2d 1251, 1254, (stating there is only one taking). Thus, GRDA maintains: 1) any damages before the date of taking are time-barred; 2) any damages after the date of taking are barred because the property had previously been taken; and 3) the only damages that may be properly awarded are those for the value of the property interest taken.

¶ 18 Landowners disagree, asserting their properties were subject to a series of recurring flooding and that the trial court correctly determined the dates and interests taken.

¶ 19 In the present case, the court determined the dates and interests taken as follows:

- Perrys: April 7, 1994: the beginning date of the flood in the series of floods which reached the highest elevation on their property; a flowage easement

- Pryors: a temporary taking from September 1993 through June 1995

- Shaws: June 2, 1995: the beginning date of the last flood in the series of floods; a fee title

¶ 20 In an inverse condemnation proceeding involving a series of floods, *i.e., **intermittent and inevitably recurring flooding,*** as in the present case, we conclude the date of taking is not the date the first flood substantially interferes with the landowner's use and enjoyment of the property. Rather, the date of taking is that date when it becomes clearly apparent that the series of flooding is caused by the government or governmental entity having the right of eminent domain, is of a permanent nature *i.e.,* although intermittent and temporary in duration, is inevitably recurring, and substantially or sufficiently interferes with the landowner's use and enjoyment of the property.[13] See *Henthorn,* 1969 OK 76, at ¶ 10, 453 P.2d at 1015. The determination of these questions by the trier of fact will not be disturbed on appeal if supported by competent evidence.

¶ 21 With respect to the interest taken, GRDA initially asserted the proper remedy was a flowage easement. A flowage easement is the right to overflow the land of another in the accumulation and maintenance of an artificial body of water. 78 Am.Jur.2d Waters § 261 (2011). In its supplement

11. In an inverse condemnation proceeding, issues regarding whether a taking has occurred, the date of taking, and the measure of damages are all questions of fact for the trier of fact. See e.g., *State ex rel. Dept. of Transp. v. Post,* 2005 OK 69, 125 P.3d 1183 (In an inverse condemnation proceeding, the commissioners' report is irrelevant and does not decide the issue of a taking); *Williams v. State ex rel. Dept. of Transp.,* 2000 OK CIV APP 19, ¶ 13, 998 P.2d 1245 (determination of a taking must be made by the trier of fact). Conversely, regular condemnation proceedings are governed by legislatively-prescribed procedures which are ordinarily designed to resolve only the issue of just compensation. These procedures are not designed to deal with the issue of whether there has been a taking since an actual taking must occur before the process can begin.

Thus, condemnation procedures, including the appointment of commissioners, are not followed in inverse condemnation proceedings.

12. Again, it is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation. *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973).

13. This rule should not be read to exclude a temporary flood invasion from takings liability. This rule only applies to those situations involving intermittent and inevitably recurring flooding.

briefing after oral argument, however, GRDA asserted granting a flowage easement may be unrealistic and that the transfer of a fee simple interest may be the only rational remedy in this case.

¶ 22 The determination of the appropriate interest taken is a question of fact for the trier of fact. If Landowners are capable of making valuable uses of their property despite the recurring flooding, a flowage easement may be the appropriate interest taken. However, if the trier of fact determines a Landowner's property is no longer useful for any purpose, GRDA's actions may constitute a complete taking. This is a question of fact for the trier of fact.

¶ 23 Accordingly, we reverse and remand to the trial court for a redetermination of the dates of taking and interests taken, either a flowage easement or fee simple interest, in accordance with this opinion. The determination of these issues is a prerequisite to the determination of an award of just compensation. However, the Court notes that pursuant to Art. II, § 24 of the Oklahoma Constitution, Landowners are entitled to recover just compensation for all property taken or damaged for public use whether the damages are direct or consequential. "[T]he required payment for 'just compensation' is not limited to property 'taken,' but extends also to property 'damaged.' " *Williams*, 2000 OK CIV APP 19, at ¶ 14, 998 P.2d at 1249. "The essential consideration in determining compensation for a taking of a property interest is to put the property owner in as good a position as it would be if no taking had occurred." *Material Serv. Corp.*, 2012 OK CIV APP 17, at ¶ 13, 273 P.3d at 887.[14]

## B. Statute of Limitations

¶ 24 Landowners counter-appeal, asserting the trial court erroneously applied the two-year statute of limitations in 12 O.S.

2011, § 95(A)(3) to their personal property losses. Landowners contend the fifteen-year inverse condemnation limitation period applies to all property taken, asserting personal property taken by flooding is an element of the total value of a landowner's award of just compensation. Landowners maintain that subjecting real and personal property to differing statute of limitations is arbitrary and inconsistent with the underlying policy of Article II, § 24 of the Oklahoma Constitution and fails to make the landowner "whole" and, in reality, collapses the entire action to a two-year statute of limitation whenever personal property is taken. Finally, Landowners assert that rules of statutory construction require rejection of the two-year provision, noting § 95 sets forth the limitations periods to bring "[c]ivil actions other than for the recovery of real property" and generally pertains to a list of tort actions.

¶ 25 GRDA disagrees, asserting Oklahoma statutes clearly provide that a fifteen-year limitations period applies to "an action for the recovery of real property ..." and a two-year limitation period for damages to personal property, citing 12 O.S.2011, § 95(3). GRDA asserts that personal property is not "taken," *i.e.*, the government does not take title to the property as it does with real property, but is merely damaged or injured, citing *State ex rel Dept. of Transp. v. Little*, 2004 OK 74, ¶ 19, 100 P.3d 707, 717 ("A condemnee is entitled to compensation for 'damages to personal property incident and necessarily caused by the exercise of the power of eminent domain in taking land.' ") Thus, GRDA contends the statute of limitations for personal property is properly two years.

¶ 26 Article 2, § 24 of the Oklahoma Constitution does not contain a limitations period, nor does it distinguish between real and personal property, but extends just compensation to all private property taken or damaged.[15] In *Drabek v. City of Nor-*

---

14. In the present case, GRDA chose not to condemn Landowners' properties despite recurrent flooding. Following each flood, Landowners restored and repaired their properties, not knowing that their properties would be subject to recurring flooding caused by operation of the Pensacola Dam. Landowners were required to file for inverse condemnation and are entitled to be fully compensated under the law as a result of the taking. *See also* fn. 18, *infra*.

15. A plaintiff may recover for personal property in an inverse condemnation case. The wording of Art. II, § 24 of the Oklahoma Constitution

*man*, 1996 OK 126, at ¶ 4, 946 P.2d at 660, the Oklahoma Supreme Court noted that "[n]either statute nor constitution establishes a limitation period for bringing a suit in inverse condemnation. Case law has determined limitations periods based on whether there has been a taking." The Court subsequently held the fifteen-year prescriptive period was appropriate where there was a taking of real property without just compensation. *Id.*, 1996 OK 126, at ¶ 5 & 16, 946 P.2d at 660 & 661–62 ("Early case law established the fifteen-year period governing adverse possession to be the appropriate limitation period in an inverse condemnation proceeding where there was a taking of plaintiff's property for public use without compensation.") The applicable limitation period for personal property in an inverse condemnation action has not been addressed in Oklahoma.

 ¶ 27 Condemnation proceedings, including inverse condemnation, do not involve a tort and are not, strictly speaking, civil actions or suits. Inverse condemnation is a special statutory proceeding for the purpose of ascertaining just compensation. *Drabek*, 1996 OK 126, at ¶ 8, 946 P.2d at 660; *Oklahoma City v. Wells*, 1939 OK 62, 91 P.2d 1077. In an inverse condemnation proceeding, the claim for "just compensation" includes all taken or damaged property, whether real and personal. The proceeding is designed to determine in a single action all compensation for property taken from private persons for public use.

 ¶ 28 If the Court applies the two-year limitation period as GRDA asserts, widely divergent limitations' periods to recover just compensation for the same govern-mental action in the same inverse condemnation proceeding would be applicable. "The underlying purpose of statutes of limitations is to prevent the unexpected effort at enforcement of stale claims concerning which persons interested have been thrown off their guard by want of prosecution for a long time." *Wing v. Lorton*, 2011 OK 42, ¶ 11, 261 P.3d 1122, 1125 (citing *Seitz v. Jones*, 1961 OK 283, ¶ 11, 370 P.2d 300, 302). It is designed to end stale claims and compel parties to diligently pursue their claim before relevant facts are obscured through the passage of time. *Id.*

 ¶ 29 In the present case, a party could be deprived of a component of just compensation, *i.e.*, personal property damages, through application of multiple statutes of limitations even though recovery of just compensation for real property and associated damages remains viable. Article II, § 24 of the Oklahoma Constitution provides that "Private property shall not be taken or damaged for public use without just compensation. . . ." "The term 'property' as used in our Constitution regarding the taking of private property for public use for which just compensation must be paid includes not only real estate held in fee, but also easements, personal property and every valuable interest which can be enjoyed and recognized as property." *Little*, 2004 OK 74, at ¶ 22, 100 P.3d at 718.

> This court should never be unmindful that a landowner is entitled to be compensated fully when the latter's property is taken by the government in the exercise of the eminent domain power. The mandate of both the state and federal constitutions strongly supports full indemnification by just com-

---

does not distinguish the type of property covered in the Article. *State ex rel. Dept. of Transp. v. Little*, 2004 OK 74, 100 P.3d 707; *Blincoe v. Choctaw Oklahoma & Western R.R. Co.*, 1905 OK 120, 16 Okla. 286, 83 P. 903; *see Broward County v. Rhodes*, 624 So.2d 319 (Fla.Dist.Ct.App. 1993) (recognizing that personal property may be the subject of inverse condemnation); *Hawkins v. City of La Grande*, 315 Or. 57, 843 P.2d 400 (1992). This Court notes the case of *Pete v. U.S.*, 569 F.2d 565 (Cl.Ct.1978), where the plaintiffs were held to be entitled to recover litigation expenses in a successful inverse condemnation action for the taking by a federal agency of their

personal property. In *State ex rel. Dept. of Transp.*, 2004 OK 74, at ¶ 22, 100 P.3d at 718, the Court stated:

> [Art. II, § 24] is not by its terms limited to real property nor does it exclude from compensable injury damage to personal property when an entire tract of land is taken. "The term 'property' as used in our Constitution regarding the taking of private property for public use for which just compensation must be paid includes not only real estate held in fee, but also easements, personal property and every valuable interest which can be enjoyed and recognized as property." . . .

pensation. The command requires that the condemnee be placed as fully as possible in the same position as that occupied before the government's taking.

*Id.* at ¶ 23, 100 P.3d at 718 (citing *Oklahoma Turnpike Auth. v. New Life Pentecostal Church of Jenks,* 1994 OK 9, ¶ 12, 870 P.2d 762, 766). Furthermore, a limitations period should not become an instrument of injustice. *See* 54 C.J.S. Limitations of Actions § 2 (2013).[16]

¶ 30 Accordingly, we decline to impose such a result and find the appropriate statute of limitations period applies to the claim and not to the individual components of relief in an inverse condemnation proceeding. Thus, we hold the appropriate limitations period is fifteen years for an inverse condemnation proceeding for the taking or damaging of all private property, including real and personal. This result avoids divergent limitations periods for components of a single claim and does not require the owner to resort either to piecemeal or premature litigation to ascertain just compensation. Thus, the trial court erred in applying the two-year statute of limitations to Landowners' personal property claims, and this portion of the trial court's order is reversed.

¶ 31 **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

THORNBRUGH, P.J., concurs and and RAPP, J., concurs in part and dissents in part.

RAPP, J., concurring in part and dissenting in part.

¶ 1 While I agree that all of the Grand River Dam Authority's (GRDA) appeal must be reversed, I dissent from the resolution of these appeals by the Majority.

¶ 2 I concur with the Majority's Decision that the fifteen-year Statute of Limitations applies to each of the individual landowner's claims for just compensation for taking of personal property. However, because there are issues about the taking and dates of taking, I would have the trial court apply the fifteen-year limitation only after the takings issues are resolved.

## I. GRDA Appeals.

¶ 3 My point of departure from the Majority begins with its direction to the trial court to re-determine the dates of takings and interests taken, either of a flowage easement or fee simple interest. The Majority's directive to the trial court does not comport with the facts of the case as to each individual landowner and omits consideration of a temporary taking along with the separate measure of damages where the taking is temporary.

¶ 4 Although each landowner suffered from flooding caused by GRDA, there are material facts unique to each case. Thus, a review of the facts and the trial court's dispositions are in order.

¶ 5 Flooding occurred in 1986, September 1993, April 1994 and June 1995. The 1986

---

**16.** The federal court applies the stabilization doctrine in flooding cases. In *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the U.S. Supreme Court held "[w]hen a taking is caused by a continuous process, it is not complete, for purposes of determining when the claim arose, 'until the situation becomes stabilized.'" In *Dickinson,* the government took property through a "continuing process of physical events." The landowners filed an inverse condemnation proceeding alleging the flooding was a taking. The Court ruled that under such circumstances, because the government had put the "onus of determining the decisive moment in the process of acquisition by the United States" on the landowner, the landowner was permitted to postpone filing suit "until the situation [became] stabilized." *Id.* at 748–49, 67 S.Ct. 1382. "The Fifth Amendment expresses a

principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die." *Id.* at 748, 67 S.Ct. 1382. Thus, *Dickinson* warned against applying an excessively rigid rule when the government takes property through a gradual physical process. *Id.* at 749, 67 S.Ct. 1382. "[W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Id.* Although not controlling in Oklahoma, we find the stabilization doctrine persuasive in determining the applicable statute of limitations in the present case.

flood affected the Shaws' property. The trial court's finding that about one-half of the flood water depth in 1986 was due to GRDA has not been disputed in this appeal. The 1986 flood also affected the Pryors' property, but Pryors did not own the property at that time, having purchased it in 1989 with knowledge of the 1986 flood. Each flood in 1993, 1994 and 1995, above a pre-existing flowage easement, was caused by GRDA for all of the properties.

### A. Perrys' Property Facts.

¶ 6 Perrys' property was flooded in September 1993, along with the crawl space of the residence. The residence and property were subject to flooding in April 1994, and June 1995. On each occasion, the Perrys' cleaned and restored their residence and moved back into it. The trial court itemized a list of damages on each occasion including value of time and the costs of cleaning and restoring. The Perrys were deprived of the use and enjoyment of the home on each flood event ranging from forty hours in 1993 and 1995 to three months in 1994. The April 1994 flood was the flood that reached the highest elevation and the court ruled that this flood constituted a taking of the flowage easement on Perrys' property and established the date of taking as April 7, 1994. Damages were awarded for clean-up time and costs as to all floods and for the easement.

### B. Pryors' Property Facts.

¶ 7 Pryors' property was subject to flooding in September 1993, but not the residence. The floods of April 1994, and June 1995, also affected the residence. The property also flooded in 1986 to a depth of five feet, with three and one-half feet of that flood due to natural causes and the balance the GRDA Dam operation. The owners in 1986 abandoned the property and Pryors acquired property in 1989, after being informed of the 1986 flood history.

¶ 8 On each occasion during their ownership, the Pryors' cleaned and restored their property and moved back into the residence. The 1993 flood did not enter their home. The 1994 flood resulted in two feet of water in the home. The 1995 flood had water in the duct work under the house. The trial court itemized a list of damages on each occasion including value of time and the costs of cleaning and restoring.

¶ 9 The Pryors were deprived of the use and enjoyment of the home for six months after the 1994 flood. On the occasions of the 1993 and 1995 floods, they spent a number of hours in cleaning and restoration. The trial court found that this series of floods "significantly impacted and interfered with" Pryors' use and enjoyment of their property. However, they continued to live there until 2005, when they sold the property. No flowage easement was taken, but the trial court awarded damages for clean-up time and costs and diminished value of the property.

### C. Shaws' Property Facts.

¶ 10 Shaws' property was subject to flooding in September 1993, April 1994, and June 1995. The property and residence was also the subject of flooding in October 1986 to a depth of four feet, of which about one-half of the depth of the flood water was due to natural causes and the balance due to the GRDA Dam operation.

¶ 11 On each occasion until 1995, the Shaws' cleaned and restored their property and moved back into the residence. After the 1995 flood, Shaws abandoned the property due to the series of floods from 1986 to 1995, but retained title to the property.

¶ 12 Damages were incurred for cleaning and restoring the property after the floods, until 1995. The trial court itemized these damages and awarded Shaws damages for clean-up time and costs attributed to the 1986, 1993, and 1994 floods. The trial court prorated the 1986 damages based upon natural cause.

¶ 13 The fair market value of Shaws' property before the 1993 flood was $54,600.00 and the value of the real property was $500.00 after the 1995 flood. Approximately, one-half of the property was subject to the existing flowage easement, but the home was on the one-half above the flowage easement.

¶ 14 The sum of $54,600.00 was awarded for the diminished value of their property

caused by the series of floods from 1993 to 1995. The trial court established June 2, 1995, as the date of taking and that the fee was taken, so GRDA was awarded the fee title as of that taking date.

## II. Analysis of the Taking Claims.

¶ 15 "Inverse condemnation" is not a means of property acquisition but, rather, is the landowner's remedy for uncompensated takings of property for public use. The Majority correctly observes that whether a taking has occurred and the date of the taking present questions of fact in inverse condemnation cases.[1]

¶ 16 Moreover, a taking may result from a series of actions, either continual or continuous in nature. *Arkansas Game and Fish Comm'n v. U.S.*, —— U.S. ——, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012); *State ex rel. Dep't of Transp. v. Hoebel*, 1979 OK 63, 594 P.2d 1213; *Henthorn v. Oklahoma City*, 1969 OK 76, 453 P.2d 1013.

¶ 17 In addition, a taking may be permanent or temporary. *Material Service Corp. v. Rogers County Bd. of Comm'rs*, 2012 OK CIV APP 17, ¶ 9, 273 P.3d 880, 885. The measure of compensation is not the same for a permanent taking as for a temporary taking.

¶ 18 A permanent "taking" of property, or an interest in property, consummates a transfer of the property, or an interest in property, to the taker on the date of taking. The date of taking establishes not only the date of transfer, but also the date on which the value of the transfer is to be calculated. This rule is self-evident in cases of a single action resulting in a taking. This rule provides for full compensation to an inverse condemnation claimant. Also, the rule establishes a reasonable and efficient criterion in cases of ongoing or repeated action. Thus, damages can be made certain and bear a reasonable relationship to the responsibility of the taker to pay compensation.

¶ 19 In the case of a temporary taking, the cases reflect different approaches to achieve the just compensation result. One method is to determine the rental value of the property for the period it was taken plus any actual damage sustained as a result of that taking. Another method would compensate based upon the loss of the economic use of the property. "It has been said that, in cases involving a temporary taking, the best approach is a flexible approach that will compensate for losses actually suffered while avoiding the threat of windfalls to plaintiffs at the expense of substantial government liability." *Material Service Corp.*, 2012 OK CIV APP 17 at ¶ 10 n. 5, 273 P.3d at 886 n. 5.

¶ 20 Restoration costs may be awarded in temporary taking cases instead of diminution in value. *Fowler Irrevocable Trust 1992–1 v. City of Boulder*, 17 P.3d 797, 805–06 (Colo. 2001); *Sunburst Sch. Dist. No. 2 v. Texaco*, 2007 MT 183, ¶ 38, 338 Mont. 259, 165 P.3d 1079, 1087–88 (2007) (pointing out that a residence is the type of property that the owner would wish to repair).

¶ 21 I would hold that, in cases of a temporary taking of real property, the measure of compensation is the rental value for the temporary period of the taking plus any actual damages and restoration costs. In cases of a permanent taking of any type of property, the measure of compensation is the fair market value of the property interest taken on the date of taking, plus any actual damages and restoration costs.

## III. Application to Each Landowner.

### A. Perrys' Property.

¶ 22 The trial court's damage determinations for each of the three flood years, 1993–1995, included: (1) restoration costs, including personal time; (2) losses related to personal property; and (3) accumulated diminution of value of the real property over repairs and restoration, with that sum apparently being awarded for the flowage easement granted to GRDA. However, there was a single taking of a flowage easement only in 1994.

---

1. At oral argument, GRDA conceded that a taking occurred, but did not concede the dates as found by the trial court.

¶ 23 The trial court found that the taking by GRDA amounted to a flowage easement, with the date of taking of April 7, 1994. There is a fact-dependent point at which a substantial interference with the landowner's use and enjoyment of the property constitutes a taking. Here, in Perrys' case, the trial court made a single finding of a taking. Given a single taking, the trial court erred in assessing damages over a three-year period.

¶ 24 In a single taking case, with a taking date in April 1994, the damages for personal property losses, restoration and cleaning incurred prior to or after that date of taking do not represent just compensation for the taking in April 1994. It is true, under the facts here, that the Perrys sustained losses in 1993 and 1995 and that GRDA is responsible for those losses. However, in a single taking case, the claims for the 1993 and 1995 losses are not supported by a taking theory and would then be ordinary damage claims.[2]

¶ 25 However, the trial court also made findings that the 1993 and 1995 floods constituted interference with the Perrys' use and enjoyment of their property. This finding is a predicate to the ultimate conclusion that a taking, temporary or permanent, has also occurred in those two years. Nevertheless, the trial court did not specifically find either a permanent or temporary taking attributed to these two floods.

¶ 26 Therefore, I would rule that the trial court must specifically determine from the evidence whether the 1993 and 1995 floods also constituted takings, and if so to define the nature of the takings of the Perrys' real property as *temporary or permanent.* The existence of these takings is a necessary requisite to an award of compensation for these events and the method of calculation of compensation.[3]

¶ 27 In the event the trial court determines that a taking occurred as a result of any of these other floods, then I would have the

trial court determine whether any personal property was also taken and award compensation, if any, for the personal property taken. If the trial court finds that there was not a taking, then the acknowledged losses do not become losses to be compensated in an inverse condemnation proceeding.

¶ 28 All compensation for any taking must be calculated as of the date of taking. At first, it would appear that recovery of compensation associated with restoration after the 1994 flood is inconsistent with recovery of compensation associated with diminution of value as a result of the flowage easement. However, the facts show that Perrys returned to the residence after the 1994 flood that resulted in the taking of the flowage easement, thereby not foreclosing any cleaning and restoration costs.

¶ 29 The trial court incorrectly aggregated all three flood years to determine the diminution in value of Perrys' real property. The measure of damages in the Perrys' case for the taking of a flowage easement is the diminution of the market value of their property, with the valuation date being the date of taking, April 7, 1994. Moreover, it is necessary to consider the effect of any determination of a permanent taking in 1993. Thus, I would also reverse the judgment for Perrys for compensation for the flowage easement on this ground.

¶ 30 Personal property taken is subject to compensation and the claim therefore is not time barred. Nevertheless, there must be a determination that the personal property was taken and a date of taking. The trial court's judgment denying recovery for personal property compensation must be reversed and this aspect of the case is remanded for the required takings determinations.

### B. The Pryors' Property.

¶ 31 The trial court found that the Pryors sustained temporary takings as to each of the

---

2. I do not agree with GRDA's position that the award of a 1994 flowage easement precluded damages occurring within the easement in 1995. Perrys had not been paid for the easement in 1995 and it did not then exist by virtue of a court decree. It would be unfair to impose a constructive notice of the easement on them.

3. The final determination may affect the compensation calculation for a subsequent event, and the trial court can make such adjustment as the case warrants.

floods in 1993, 1994 and 1995.[4] The judgment does not specifically find a date, or dates, of taking. ·

¶ 32 The trial court's separation of compensation for the restoration and clean-up suggests three takings dates, one for each flood year. However, the aggregation of the three years for purposes of calculating diminished value, suggests that the last flood year culminated in a permanent taking. Nevertheless, the Pryors' journal entry is that the trial court made a finding of a temporary taking.

¶ 33 Thus, the judgment is internally inconsistent and its findings do not resolve the issue of compensation. The trial court's assessment of both restoration and diminution of value damages was inconsistent in light of the conclusions that: (1) restoration costs were incurred to restore the property to its condition prior to each flood; and (2) takings in each case were temporary.

¶ 34 Ordinarily, "restoration" and "diminution of value" are mutually inconsistent as measures of damages.[5] Property that is "restored" would not lose its pre-restoration value. On the other hand, property that is not, or cannot be, fully restored would diminish in value and, to that extent, the entity using the property has taken a property interest. Here, the Pryors' judgment is inconsistent as drafted because it finds both a restoration to original condition and a diminution of value.

¶ 35 However, the trial court's award of damages for restoration associated costs for the 1993, 1994 and 1995 floods amounted to sums "to restore the property to its condition immediately before the flood." [6] This conclusion is not consistent with a partial restoration case where both restoration costs and diminution of value could be considered to make the property owner whole for a permanent taking.

¶ 36 Next, the trial court used the measure of compensation applicable to a permanent taking. As shown above, the measure of compensation for temporary takings is the rental value for the temporary period taken plus any actual damages and restoration costs. Therefore, I would reverse the judgment for fair market value and remand for redetermination of compensation for the temporary taking of the Pryors' real property. The denial of their claim for personal property compensation would also be reversed to determine whether personal property was taken on the date, or dates, of takings as found by the trial court and to award just compensation for such takings, if any.

4. Thus, they had no interest in 1986 subject to a taking and compensation. The trial court did not account for whether the 1986 flood also amounted to a taking, and, if so, the extent of the 1986 taking. GRDA would have the taking occur in 1986, apparently to deprive Pryors of some or all of the compensation. However, this position was taken for the first time on appeal.

It is noted that the trial court did award compensation to the Shaws for the 1986 flooding. Initially, this would appear to be an inconsistent outcome, resulting in a windfall recovery to the Pryors for failure to account for a taking prior to their ownership of the property.

However, I would conclude otherwise. First, assuming a permanent taking in 1986, GRDA had not paid compensation for the taking and it would be unfair to charge the Pryors with constructive notice of an undefined, uncompensated taking even though they were aware of the 1986 flooding.

Second, all of the takings in Pryors' case are temporary. Unless GRDA were awarded a fee taking retroactively, the temporary taking would still be supported by the evidence and a reduction of compensation would result in a windfall for GRDA.

5. The market value approach is the usual means of measuring damages, but not always. See Fowler Irrevocable Trust 1992–1, 17 P.3d at 803; City of Tulsa v. Mingo Sch. Dist. No. 16, 1976 OK CIV APP 27, 559 P.2d 487 (in a partial taking case, the restoration costs are appropriate measure of damages where property has special use).

The case of State v. Levick, 1961 OK 215, 365 P.2d 141, is distinguished. The Court held that the before and after market value was the correct measure of damages where the State sought a temporary right to remove sand and gravel. There, unlike here, the State physically removed, took possession and used materials from the owner's property.

6. A total restoration would authorize consideration of damages measured by rental value or costs of alternative living arrangements during the restoration period. See Gledhill v. State, 123 Neb. 726, 243 N.W. 909 (1932) (the damages for property taken temporarily is not the market value, but the value of the use for the period damaged).

¶ 37 Therefore, I would reverse the trial court's judgment as to the amount of compensation awarded to the Pryors for restoration and· associated costs and for diminution of value and remand to decide the date, or dates, on which a temporary taking occurred and to award compensation for the temporary taking.

### C. The Shaws' Property.

¶ 38 The trial court awarded the Shaws cleaning and restoration damages due to the 1993 and 1994 floods. The trial court awarded a prorated sum for the 1986 flood based upon the finding that one-half of that flooding of their property was naturally caused. In each instance, the trial court found that the Shaws expended the sums to restore their property to its original condition.

¶ 39 Shaws abandoned their property after the 1995 flood. The trial court established the June 2, 1995, flood date as the date of taking and determined that the extent of the taking was the entire fee interest as of that date. The trial court's selection of this date as the taking date, rather than one of the other three flood dates, and the extent of the taking, is inconsistent with an award of compensation for the other flood events absent a finding of a taking, temporary or permanent, on those prior occasions.

¶ 40 The trial court did not use a market value immediately before the 1995 flood as the beginning value for the Shaws' real property. However, GRDA specifically does not contest the calculation of damages. Therefore, GRDA waived any error in the selection of a beginning valuation date. Therefore, I would not disturb the finding of $54,200.00, as the value of the real property before the onset of the 1995 flood.

¶ 41 The selection of the 1995 flood date as the taking date results in similar legal issues as those in the other two cases.[7] Thus, absent a date of taking corresponding to the earlier floods in 1986, 1993 and 1994, the damages associated with these events become claims not based upon inverse condemnation. As a result, GRDA is responsible for the damages for restoration associated costs and personal property losses, but the Shaws' claim for these pre–1995 events would be time-barred if there were no earlier takings.

¶ 42 This Court should require that the trial court must specifically determine whether the 1986, 1993 and 1994 floods also constituted separate takings of Shaws' property, and, if so, to define the nature of the takings and fix just compensation, if any, in accord with those findings. The existence of those takings is a necessary requisite to an award of just compensation for these·events. After making these findings and awarding any compensation, the trial court should then be directed to adjust the fee taking, if appropriate, to account for prior permanent takings of the real property. In the event the trial court determines that a taking occurred as a result of any of these earlier floods, then the court should further be directed to determine whether any personal property was also taken and award compensation, if any, for the personal property taken.

### D. Statute of Limitations.

¶ 43 The Majority correctly rules that the appropriate limitation period is fifteen years for the inverse condemnation claim for taking personal property. This result is consistent with the case authority where the claim involved only real property and is consistent with the "transactional approach" in civil actions. The result avoids having divergent limitations periods for components of a single claim. However, I would further rule that whether the plaintiffs may avail themselves of the fifteen-year period in this instance depends upon whether a taking has occurred, and whether a taking occurred is also an issue for the real property parts of the case.

### IV. Summary

¶ 44 When, as here, a government entity damages real or personal property by its actions, the injured party might seek compensation either under a theory from ordinary civil litigation, or under a special proceeding, termed inverse condemnation. The

---

7. However, the trial court made no award for personal property losses from the 1995 flood and there were no restoration associated costs for that flood.

injured party must establish the fact of taking in order to recover.

¶ 45 The taking occurs when the governmental action has resulted in the substantial interference with the use and enjoyment of the injured party's property. The fact of taking may be permanent or temporary and may include personal property. In inverse condemnation cases, whether there is a substantial interference with the use and enjoyment of property, the extent of the taking and the compensation for the taking are questions for the trier of fact.

¶ 46 A taking might result from a series of acts, here a series of floods. In such cases, the trier of fact determines the date (or dates if more than one taking is found) on which the substantial interference occurred. However, the trial court must determine: (1) whether the taking is permanent or temporary, and, if permanent the extent thereof; and (2) a date, or dates, of taking. Then, when a decision is reached that a taking has in fact occurred and its scope, together with the date of taking, the trier of fact can proceed to the question of just compensation.

¶ 47 In the cases under review, the trial court made findings consistent with takings on each flood event. However, as to the Landowners Shaws and Perrys, the trial court also fixed only single date of taking. Nevertheless, the trial court awarded compensations covering the entire series of floods affecting these Landowners. The trial court erred and must find also that a taking occurred on each occasion in order to provide an inverse condemnation basis for an award of compensation as to each occasion.

¶ 48 The trial court's judgment contains inconsistent measures of compensation for the Shaws and the Perrys. Recovery for total restoration and diminution of value of the same property are mutually inconsistent. Here, the trial court's judgment and findings reached inconsistent results by awarding both types of recovery. In an appropriate set of facts and findings, an injured party might be entitled to recover restoration associated costs and diminution of value when the restoration was not to original condition after the taking. However, the trial court must

make findings consistent with both types of compensation, which it did not do here.

¶ 49 In the case of the Landowner Pryors, the trial court found temporary takings, but did not define the extent of the takings or any dates of taking. Nevertheless, the trial court awarded the Pryors diminution of value and restoration to original condition costs. Here also the trial court must establish takings, dates of taking, and compensations appropriate to the nature and extent of the taking. In addition, the trial court must determine whether the 1986 flood constituted a taking, and if so, the nature of the taking and account for that it in its consideration of the 1993, 1994 and 1995 floods.