# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 9, 2021      Decided January 18, 2022

No. 20-1325

THE CITY OF MIAMI, OKLAHOMA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

GRAND RIVER DAM AUTHORITY,
INTERVENOR

---

Consolidated with 20-1446

---

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

---

*David M. Gossett* argued the cause for petitioner. With him on the briefs was *Barbara S. Jost.*

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Misha Tseytlin* argued the cause for intervenor. With him on the brief were *Charles R. Sensiba*, *Elizabeth J. McCormick*, and *J. Houston Shaner*.

Before: HENDERSON and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: The City of Miami, Oklahoma complained about periodic flooding which it asserted comes from the operation of the Pensacola Project, a downstream dam licensed by FERC. It petitions for review of FERC orders that reject its complaint on several grounds. We think FERC's position is surprisingly unpersuasive. We grant the City's petitions and remand for further proceedings to the agency.

## I.

Although the City has repeatedly raised its concerns in ancillary FERC proceedings, it received no relief. In one prior case, called a rule curve proceeding,[1] the Commission explicitly stated that it would not consider, at least in that case, the City's concerns. That led the City to sharpen its position. It brought a complaint directly challenging the Grand River Dam Authority that operates the Pensacola Dam, contending

---

[1] A "rule curve" describes a permitted range for how high the reservoir can get. A rule curve proceeding is initiated when a party wishes to change that range.

that it violated Article 5 of its license, issued to it by FERC under the Federal Power Act. That provision obliges the Authority to:

> [A]cquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, *necessary or appropriate* for the construction, maintenance, and operation of the project. (emphasis added).

The City maintains that Article 5 obliges the Authority to gain "flowage rights" by either purchasing property or acquiring an easement from the City to defray the cost of future flooding (the Authority contended that an easement would be quite expensive, and the cost would be passed on to ratepayers).[2]

The City has also pursued actions in Oklahoma state courts seeking compensation for past floods. It produced extensive evidence that previous damage was caused by flooding attributable to the operation of the Pensacola Dam. The Oklahoma courts decided in favor of the petitioner. *See, e.g.*, *Dalrymple v. Grand River Dam Auth.*, No. CJ 94-444 (Okla. Dist. Ct. Nov. 5, 1999), amended, Jan. 11, 2000; *McCool v. GRDA* No. 97-020 (Okla. Civ. App. June 15, 2004); *Perry v. Grand River Dam Authority*, 344 P.3d 1 (Okla. Civ. App. 2013). The evidence presented to the Oklahoma courts was also submitted to FERC in this case along with several studies essentially showing the same thing.

Quibbling with the evidence, the Authority blithely asserted the dam's operations were not responsible for any

---

[2] The City notes that the Authority had previously purchased some flowage rights and recognized an obligation to purchase more before reversing course and claiming that it had no obligation to do so.

flooding outside the project's exact boundaries—a much more limited territory than the property at issue—and in any event, the Authority blamed the U.S. Army Corps of Engineers as responsible for flood control.

While the Commission's response was pending, Congress jumped into the fray. It passed a floor amendment to the Defense Authorization Act seemingly addressing the controversy. One provision of the amendment is particularly relevant: "The licensing jurisdiction of the Commission for the project shall not extend to any land or water outside the project boundary." National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 7612(b)(2)(A), 133 Stat. 1198, 2312 (2020).

FERC's staff in a letter order acknowledged that the City was correct in reading Article 5 to impose on the Authority obligations beyond the project's boundaries. The staff in a rather conclusory manner and without analysis however, asserted that there was no substantial evidence that the Authority's operation of the dam caused the flooding at issue. It then concluded that the Authority was not in violation of its license because "the Commission has never determined that any additional lands or land rights (i.e. flowage rights) [beyond the project boundaries] are *necessary*." (emphasis added). Since the City was asserting these rights in this very proceeding—and the Commission, as opposed to the staff, had yet to answer the claim—the staff's response was illogical because it essentially assumed the conclusion.

Alternatively, the staff's letter order relied on the floor amendment of the Defense Authorization Act—without actually interpreting it—as blocking the City's relief.

The City sought rehearing before the Commission. Over a dissent, FERC rejected the City's appeal. First, the Commission disposed of the Authority's claim that the responsibility for flooding beyond the project boundary was that of the Corps of Engineers by simply stating mysteriously that the responsibility of the Corps was "not presented by this case."

The Commission instead described the case before it as presenting only a narrow issue: "whether, because of the frequent flooding of lands outside the project boundary, [the Authority] is in violation of Article 5 of its project's license for failure to obtain flowage rights on these lands." FERC then sustained the staff's conclusion that the flooding evidence petitioner had presented was insufficient simply stating as an *ipse dixit* that "lands outside the project boundaries are not flooded due to the Project's operations."

The Commission added that the flooding issue can be explored in depth in the upcoming relicensing proceeding, scheduled in 2025, at which point FERC would consider whether lands "are needed for project purposes."

Finally, the Commission unlimbered the statutory howitzer.

> [T]he Pensacola Act specifically deprives the Commission of jurisdiction over 'any land or water outside the project boundary' and further provides that lands outside the project boundary shall not be considered to be part of the project. Accordingly, we cannot, as a matter of law, require [the Authority] to acquire and bring additional lands within the project boundary.

6

II.

We start by acknowledging that we are completely at sea regarding the role of the Corps of Engineers, which may be the *deus ex machina* of this play. *See generally Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) (holding that temporary flooding caused by the Corps of Engineers' operation of a dam could potentially be compensable through the Takings Clause). There is no point in describing the Authority's contentions in this regard because FERC simply ignored the Corps of Engineers' alleged responsibility. Moreover, the Department of Justice—which presumably would represent the Corps—did not appear in this proceeding. And we have no idea what authority FERC exercises over the Corps' role. Therefore the Authority's alternative claim that the responsibility for the flooding in the City of Miami is the Corps' responsibility remains essentially unaddressed. For that reason alone, we must remand to the Commission. But there is a good deal more in FERC's order that troubles us.

First, FERC never really answers the narrow question it identified, i.e., whether Article 5 of the license obliges the Authority—putting aside the Corps' role—to acquire rights (either ownership or easements) to cover the expense of flooding in the City of Miami.

Assuming, as the Commission staff seemed to suggest, that the Authority bears that responsibility, the evidence that Pensacola Dam's operation has caused the flooding in the City is powerful. Yet FERC did not analyze that evidence. It merely asserted that its staff "review[ed]" the City's evidence. It added that the Authority—not surprisingly—had simply denied for some time that the dam operations were causing flooding. That is hardly acceptable evaluation of the evidence.

\* \* \*

Next we turn to FERC's alternative rationales. First, FERC indicated that the flooding problem can be handled in the upcoming relicensing proceeding. That runs afoul of a basic principle of administrative law: an agency faced with a claim that a party is violating the law (here an existing license) cannot resolve the controversy by promising to consider the issue in a prospective legal framework. We have previously explained that proposition in *AT&T v. FCC*, 978 F.2d 727, 731–32 (D.C. Cir. 1992). We there described the FCC's decision to take up AT&T's claim that MCI was violating existing law in a future rulemaking as an "administrative law shell game."[3] It was "a logical non-sequitur." *Id.* FERC plays that same game here. Presented with claims that the Authority is violating an existing license, FERC responds that it will look at the problem when it decides whether to issue a new license.

\* \* \*

There remains the significance of the floor amendment to the Defense Authorization Act.[4] The Authority as intervenor asserts that the statute which limits FERC's "jurisdiction" actually deprives us of Article III jurisdiction because we couldn't grant petitioner's relief. Intervenor overlooks *City of Arlington v. FCC*, 569 U.S. 290, 296–97 (2013), which explains that when Congress uses the term jurisdiction to limit an agency's power, it is really referring to an agency's authority. In other words, it is a merits issue.

---

[3] *See also MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 222 (1994) (quoting *AT&T v. FCC*, 978 F.2d at 731–32).
[4] Although FERC argues before us that this is not really an alternative holding, we think otherwise.

In that regard we think the crucial language we quoted above is ambiguous. It is unclear to us whether the amendment strips FERC of authority to enforce the existing license or that FERC's authority to impose new conditions on future licenses is limited. And that question is related to another issue. Section 28 of the Federal Power Act reserves the right of Congress to change the Act but states that such changes shall not "affect any license" issued under the Act. FERC asserts that since the Pensacola Act is specific legislation passed subsequent to the Federal Power Act, it overrides § 28. Yet the agency never actually construed the Pensacola Act, only quoting it, which means of course that is another reason we are obliged to remand.

* * *

We grant the petitions for review and remand to the Commission for it to determine the role of the Corps in this imbroglio, the responsibility the Authority bears if it caused flooding in the City, analyze the evidence petitioner has produced, and finally interpret the Pensacola Act.